# CHARLESTON

GRASS *et al*. v. BIG CREEK DEVELOPMENT CO.

Submitted January 27, 1915.   Decided March 2, 1915.

1. PLEADING—*Declaration—Demurrer—Grounds.*
   A declaration, though indefinite and uncertain, is not demurrable, if with reasonable certainty it states one or more good and not inconsistent causes of action. A demurrer does not lie for mere indefiniteness or duplicity. Such defects are curable under §46, ch. 130, Code. (p. 722.)

2. SAME—*Cure of Error—Verdict.*
   A defect in a declaration which can not be regarded on demurrer is, by §3, ch. 134, Code, cured after verdict. (p. 724).

3. TRIAL—*Answers to Interrogatories—General Verdict.*
   Answers to special interrogatories inconsistent with the general verdict will control. (p. 725).

4. JUDGMENT—*Verdict—Evidence to Support.*
   A verdict on evidence furnishing no reasonably accurate foundation for computation of damages resulting from breach of contract, can not serve as a basis for a judgment thereon. p. 729).

5. MINES AND MINERALS—*Oil and Gas Lease—Breach—Damages—Proof.*

Where no definite basis is available for the ascertainment of damages for breach of the implied covenants of an oil and gas lease, the best evidence which the circumstances will permit is all the law requires. · (p. 729).

· 6. SAME—*Oil and Gas Lease—Duty of Lessee.*

The owner of a lease for the production of oil and gas, containing the usual terms and conditions, must, if either mineral is found in paying quantities on the lands, exercise due and reasonable diligence in prosecuting operations thereunder for the mutual benefit of himself and his lessor; and if he unreasonably fails or refuses so to do, damages therefor are recoverable against him in an appropriate action at law. (p. 725).

7. SAME—*Oil and Gas Lease—Duty of Operator—Determination.*

The judgment of an operator of such lease, as to the diligence with which and the extent to which wells should be drilled thereunder, upon discovery of either mineral in paying quantities, will control, if exercised in good faith and not unreasonably or arbitrarily to promote his own peculiar benefit, to the manifest prejudice of the lessor. Both are bound by that degree of diligence which, surrounding circumstances and conditions being considered, would reasonably be expected of operators of ordinary prudence, experienced and engaged in the same business, having due regard for the interests and advantages of themselves and their lessors. (p. 725).

8. SAME—*Oil and Gas Lease—Breach—Action for Damages—Burden of Proof.*

To entitle him to damages for unreasonable or arbitrary evasion of implied covenants of an oil and gas lease, nothing therein preventing, for diligent prosecution of operations, either mineral being found in paying quantities on the premises, plaintiff assumes the burden of showing, and by clear and convincing proof must to avail him show, by witnesses having experience and skill and engaged in similar operations, that the lessee, having due regard for the advantage and profit of himself and lessor, has not, surrounding circumstances and conditions being considered, exercised ordinary diligence in conducting such operations. If he has, plaintiff can not recover. (p. 725).

9. SAME—*Oil and Gas Lease—Breach—Recovery by Lessor—Right.*

Among such circumstances and conditions are the situation of the parties; the character of the mineral products; the nature of the oil-bearing sand, whether dense or soft and porous; developments on contiguous lands, whether by same or different operators; cost of drilling; proximity to market, and facilities for marketing; current prices, whether high or low; location of the lands, and such other

conditions attendant upon the operations as may explain necessity
for prompt, or excuse for delayed, action in prosecuting such develop-
ments.   And if, considering these, the operator has exercised that
reasonable diligence and sound, practical judgment common to and
exercised by operators of ordinary prudence and experience in the
same business under the same or similar circumstances and condi-
tions, plaintiff can recover.   (p. 725).

(POFFENBARGER, JUDGE, concurring.)

Error to Circuit Court, Lincoln County.

Action by John M. Grass and others against the Big Creek
Development Company. Judgment for plaintiffs, and defend-
ant brings error.

*Reversed, and new trial granted.*

*Vinson & Thompson* and *F. C. Leftwich,* for plaintiff in
error.

*Neal & Strickling, D. E. Wilkinson* and *Campbell, Brown
& Davis,* for defendants in error.

LYNCH, JUDGE:

Of a judgment for $7000, rendered upon the verdict of a
jury in an action of assumpsit brought by John M. Grass,
defendant, Big Creek Development Company, complains on
writ of error.

In July, 1907, Grass as owner leased 100 acres of land to
C. H. Freeman for the sole purpose of mining and operating
for oil and gas, the consideration being a cash payment of
$100, one eighth of the oil produced, and $200 annually for
each gas well the product from which should be marketed and
used off the premises.  As Freeman's assignee, defendant soon
thereafter entered upon the premises and drilled four wells
producing oil in paying quantities, locating them so as to
operate as off-sets to wells previously drilled on contiguous
lands producing oil in like quantities.  Deeming the four
wells insufficient, under the implied covenants of the lease, for
the full development of the lands for oil and ample protection
from drainage through wells operated on neighboring lands,
defendant operating both tracts under similar leases, plain-
tiffs instituted this proceeding, averring, or attempting to

aver, in an original and amended declaration of one count each, two causes of action: one the breach of an implied covenant to protect against drainage, one the breach of a like covenant for the exercise of reasonable diligence in prosecuting developments necessary for extraction of all oil contained within plaintiff's lands. To these declarations defendant tendered its demurrer, assigning as grounds therefor indefiniteness and uncertainty in the statement of the causes of action, and the joinder of two causes in the same count; and of the court's action thereon it complains.

The sufficiency of a declaration indefinitely stating a good cause of action can not, with us, be tested by demurrer, but only by a demand for a bill of particulars containing a more specific statement of the cause imperfectly averred as the basis for recovery. §46, ch. 130, Code; *Clarke* v. *Railroad Co.,* 39 W. Va. 733, 742; *Transportation Co.* v. *Oil Co.,* 50 W. Va. 612; *Jacobs* v. *Williams,* 67 W. Va. 377, 380; *Gartin* v. *Coal & Coke Co.,* 72 W. Va. 405. Defendant, however, made no motion for an order requiring a specification of the particulars in which plaintiffs claimed defendant had failed to comply with the duties alleged to be so imperfectly assigned. It relied solely on its general demurrer.

Neither declaration definitely distinguishes between the breaches averred or the damages severally attributed to them. The most each pleading attempted was merely a statement of the implied covenants of the lease, and defendant's failure to perform them, whereby plaintiffs suffered damage in the amount stated in the *ad damnum* clauses. Nevertheless, it can not reasonably be said they are insufficient to impart adequate notice of the causes assigned as the basis of the action. For, while the rules of good pleading require certainty in the averment of the material facts relied on, only such circumstantial accuracy is necessary as will reasonably afford notice of what is intended to be proved. Certainty to a common intent is all that is required. If intelligible to a person of ordinary understanding, and sufficient to afford him, the court and the jury the means of determining what is intended, the pleading is sufficient. Moreover, in respect of matters peculiarly within the knowledge of defendant, he can not be heard to complain, unless the averments are so un-

certain as not to disclose the essential elements of the cause of action he is required to answer, or are so vague and indefinite that they can not be said to state any cause of action sufficient to warrant a recovery. 31 Cyc. 72, 282; *Railroad Co.* v. *Lawrence,* 169 Ind. 319; *Railroad Co.* v. *Tyree,* 110 Va. 38; *Tarnsportation Co.* v. *Oil Co., supra; Clarke* v. *Railroad Co., supra.*

Nor can duplicity in a pleading, that being defendant's second ground of demurrer, be reached in any manner except as provided by §46, ch. 130, Code, unless, as in *Knotts* v. *McGregor,* 47 W. Va. 566, there is a misjoinder of two inconsistent causes of action. There plaintiff sued for damages occasioned by breaches of the implied covenant for quiet enjoyment of leased premises—one by the testator, one by his executrix after his death. That case holds that, unless plaintiff amends his pleading by striking one or more counts from his declaration, or elects to proceed only on one assignment of the breaches averred in one count, a demurrer will lie to such declaration as a whole or to any of its counts. Generally, however, duplicity is a defect in form only, and could be taken advantage of at the common law only by special demurrer, now abolished with us by §29, ch. 125, Code. *Coyle* v. *Railroad Co.,* 11 W. Va. 94; *Sweeney* v. *Baker,* 13 W. Va. 158, 200; *Poling* v. *Maddox,* 41 W. Va. 780, 786; *Martin* v. *Railroad Co.,* 48 W. Va. 542; *Gartin* v. *Coal & Coke Co., supra.*

Evidently, in the original and to some extent in the amended declaration, the pleader's main object was recovery for drainage; and the trial of the case seems to have proceeded as if that were the sole purpose of the action. Both do aver existence of the two implied covenants for diligent operation and for protection from drainage, and defendant's breach of each of them. But, in the original declaration, the duty requiring diligence in development is merely incidentally stated. The charge made in it is that "there has been drawn from under the lands of these plaintiffs" their royalty, "at least fifteen thousand dollars worth", which royalty oil has been "delivered to the respective owners of said adjoining tract, whereby plaintiffs have lost and been deprived of great gains which might and otherwise would have arisen and accrued to them from the sale and delivery of" such royalty

"had defendant drilled off-set wells or sufficient wells upon the said premises to develop the same and to protect them from drainage against the said four wells" operated on adjoining farms. The theory as to drainage seems to permeate the amended declaration also. After specifying the wells drilled on the several tracts, including those on plaintiff's lands, it avers "no wells other than the three mentioned were drilled by defendant to develop the said farm and protect it from drainage", pursuant to the implied covenants of the lease of the breach of which complaint is made, "but that on the side of said premises next to the said four wells" on adjoining tracts "no drilling was done by the defendant, nor was any well drilled as an off-set against any one of the aforesaid wells, and the said four wells have been operated continuously since they were drilled, through which plaintiffs' oil is being taken by drainage, notwithstanding" defendant "has been in possession of the said premises under the assignment from the said Freeman during all the time" the four wells on the adjoining tracts "have been producing oil and draining plaintiffs' land". And, after averring failure by defendant to perform its covenants by properly developing said land for oil and properly protecting them from drainage of oil through the wells aforesaid on adjoining lands by off-set wells to each and every of said wells, the declaration concludes, "whereby and by means whereof the plaintiffs have been damaged in a large sum, towit, fifteen thousand dollars", and they "say that by reason of the location of the aforesaid wells near the line of these plaintiffs as aforesaid there has been drawn from under the lands of these plaintiffs their" share of the royalty in the oil, "at least fifteen thousand dollars worth as aforesaid, which said royalty oil has been drawn from under their land and been delivered to the respective owners of said adjoining tracts, whereby plaintiffs have lost and been deprived of great gains which might and otherwise would have arisen and accrued to them from the sale and delivery of said royalty to them had the said defendant drilled off-set wells or sufficient wells upon said premises to develop the same and to protect them from drainage against the said four wells".

Thus, it will appear, as suggested, that the chief purpose of

this proceeding is a recovery of the value of the oil extracted from the leased premises through wells operated on contiguous lands, although by indefinite and uncertain averments the declaration does charge a breach of the implied covenant for development sufficient to extract all oil discoverable upon the premises demised. As against this indefiniteness, defendant directed its objection under color of a general demurrer, which, as we have seen, is not available to it. And, even if the defect were so obvious as reasonably to justify allowance of a motion, if made in due time, and none was made, for a more definite specification of the cause or causes of action, no advantage can now be taken of it, under the statute of jeofails, after judgment; because, for reasons stated, the defects urged against the declarations in this action could not be regarded on demurrer. §3, Ch. 134, Code; *Holiday* v. *Myers*, 11 W. Va. 276; *Fulgham* v. *Lightfoot*, 1 Call 250; *Improvement Co.* v. *Karn*, 80 W. Va. 589; *Taylor* v. *Stewart*, 5 Call 520; *Spengler* v. *Davy*, 15 Gratt. 381.

The disposition of these defects leads to the inquiry as to the other assignments of error. We will first consider the effect of the special findings of the jury upon its general verdict. The statute authorizing this method of procedure, §5, ch. 131, Code, says: "Where any such separate verdict or special finding shall be inconsistent with the general verdict, the former shall control, and the court shall give judgment accordingly". By its negative reply to the interrogatory whether defendant failed "to drill wells upon the plaintiffs' land to properly protect" it from drainage of oil into specified wells on other lands, "and if so how many barrels of oil" plaintiffs lost "by reason of such failure", the jury eliminated any further inquiry as to damage suffered by plaintiffs from drainage. Virtually, they said there was no loss from that source. Nor does any question now arise as to the correctness of the jury's response to that inquiry. The evidence did not warrant a different answer.

Although to the question,—"Did the defendant fail to properly drill and develop the land of the plaintiffs, and if so how many barrels of oil did it fail to deliver to them by reason of such failure?"—the jury replied, "Yes", evidently as to the first proposition, and, as to the second, "The number

of barrels we can not determine", they nevertheless did fix the sum of $7000 as compensation in damages for such failure, although·in effect they conceded the insufficiency of the proof upon which to base their judgment as to the quantity of oil which defendant ought to have produced from wells not drilled which it should have drilled. Evidently, the court deemed a reasonably accurate ascertainment of the quantity of oil defendant ought to have produced but did not produce, as an essential element for recovery in the action; for, by an instruction propounded on plaintiffs' motion, the jury was required to ascertain (1) "the number of additional wells, if any, the defendant should have drilled on plaintiffs' land to sufficiently develop it, and the time when such wells should have been completed"; (2) "how much oil such additional wells would have produced from commencement of production to the bringing of this suit"; and (3) "the value of that oil in the Griffithsville field at the various times it would have been sold if it had been produced". One of these elements, so deemed essential, the jury said it could not determine from the evidence before it; and we find no data from which a different conclusion could have been reached. Without such data, it is difficult to perceive the existence of any substantial basis for the award of damages fixed as compensation for delay in productive operations on the leased premises. A jury can not mulct a suitor in damages where the evidence furnishes no reasonably accurate or substantial basis for the ascertainment and computation of the loss sustained by the breach of duty complained of. Otherwise, their verdict must be deemed to have resulted from the exercise of a mere arbitrary conclusion, one based on no substantial foundation, or, as in this case, upon proof insufficient to show breach of any duty due from defendant to plaintiffs. Construing the two responses to the dual interrogatory mentioned, in the light most favorable to plaintiffs, we can not understand how or why they were entitled, in any aspect of the case as presented, to a verdict for more than merely nominal damages. Because, although by the first answer the jury said defendant had failed to drill as many wells on plaintiffs' land as it ought to have drilled under the implied covenants of the lease, by the second it virtually said plaintiffs had failed to

furnish any proper basis for estimating the damages arising out of such breach. We reversed the judgments reviewed in *Bess* v. *Railroad*. 35 W. Va. 492, and *Douglass* v. *Railroad*, 51 W. Va. 524, the first because of the jury's negative response to the inquiry as to the name and official relation to defendant of the agent to whose assault the injury sued for was attributed, the second because the jury could not properly ascertain damages under the proof submitted to them. To avoid any misconception, in this connection, it may be observed, we do not express the opinion that, to entitle plaintiffs to recover, they must definitely prove the extent of the injury, if any, sustained by them by reason of unduly delayed developments on their lands; for only such proof as the case will reasonably admit of is required.

Evidently, plaintiffs have misconceived the theory on which they ought to have prosecuted their case to final determination. The course pursued by them apparently was based on the idea that the number of wells necessary for the extraction of all the oil from their land and the quantity of oil that ought to have been but was not produced by defendant therefrom prior to institution of this action constituted the real ground on which they had the right to predicate their claim for damages; for to this end they directed such evidence as tends to support such recovery. Whereas they are entitled only to such damages as they sustained by defendant's failure, if any, to exercise an honest judgment in proceeding with the necessary explorations on the lands and the extraction of oil therefrom, taking into consideration the subject matter of the lease, the character of the mineral products, the nature of the oil-bearing sand in that territory, the situation of the parties, the cost of drilling, the current prices of oil produced, the location of the land, and all the surrounding circumstances and conditions attendant upon operations necessary for the extraction of such mineral products. In other words, the authorities hold that if, under such circumstances, the operator exercises a sound and honest judgment, and not unreasonable or arbitrary one, in continuing operations for mineral oils, he has faithfully discharged the duties implied devolving upon him by virtue of the lease, although he may not exercise that high degree of diligence which the exag-

gerated expectations of the landowner may demand. Even
when charged with undue delays, the proof must be clear,
positive and convincing, in order to warrant recovery.

*Brewster* v. *Zinc Co.*, 140 Fed. 801, states the reasonable
rule to be: "Where the object of the operations contemplated
by an oil and gas lease is to obtain a benefit or profit for both
lessor and lessee, neither is in the absence of a stipulation to
that effect the arbiter of the extent to which or the diligence
with which the operations shall proceed; but both are bound
by the standard of what, in the circumstances, would be
reasonably expected of operators of ordinary prudence, hav-
ing regard to the interests of both". And, on the same sub-
ject, we said, in *Jennings* v. *Carbon Co.*, 80 S. E. 368: "To
the judgment of the operator, when and where and how many
wells he shall drill, deference is justly due. But the judg-
ment must be an honest, not an arbitrary, judgment. He
must deal with the leased premises, not exclusively to serve
his own peculiar and selfish interests, unmindful of his ob-
ligations to the source from which his authority is derived,
but so as to promote the mutual advantage and profit of him-
self and the lessor"; and, to excuse the operator, his judg-
ment "must conform to that judgment generally exercised
by other operators under similar circumstances and condi-
tions, and in view of the real purpose and intention of the
parties when entering into the agreement", and not merely
the opinion of those not so engaged. This statement of the
general and reasonable rule finds material support in *Harris*
v. *Oil Co.*, 57 Ohio 118, wherein it is said: "The development
and protection of lines which is implied when the lease is
silent is such as is usually found in the same business of an
ordinarily prudent man, neither the highest nor the lowest,
but about the medium or average". To the same effect is
*Guffey* v. *Chaison*, 48 Tex. Civ. App. 555. Of like import also
is the language of the trial court approved in *Bradford* v.
*Blair*, 113 Pa. 83, saying "if the knowledge and skill of
persons engaged in the oil producing business and the
machinery and appliances then known, and the prices of the
product, were such that the business could not then be carried
on with a profit to the defendant after giving to the plain-
tiff the agreed royalty, then we think the defendant was not

bound to prosecute the same with any greater diligence than was done.'' *Core* v. *Petroleum Co.,* 52 W. Va. 276; *Ammons* v. *Oil Co.,* 47 W. Va. 610, 628.

So that, in these particulars, the verdict rendered was based upon evidence wholly insufficient to sustain it; because, as clearly appears, the proof was directed solely to the number of wells necessary, in the opinion of the witnesses testifying, for the full development of the leased premises for oil and gas, and not to the degree of diligence defendant ought to have exercised. The only exception to this character of proof was the testimony of one or two witnesses, who did express the opinion that the drilling of each additional well by them deemed essential should have followed within sixty days after the completion of the preceding one. As they fixed no basis therefor, the opinion was wholly arbitrary. But, if not arbitrary, it does not measure up to the standard deemed material and requisite by the authorities cited. Has the operator been duly diligent under all the circumstances requiring him to exercise a reasonable judgment as to the proper course to pursue in regard to continuity and extent of developments? is the vital question; not how many wells are necessary to withdraw all the oil from any particular tract of land. Or, differently stated, has the operator exercised that degree of diligence reasonably and ordinarily exercised by prudent operators engaged in the same line of business under the same or similar circumstances and conditions, keeping in view the covenants of the lease and the mutual benefit and advantage of the parties to the contract? If he has been thus diligent, plaintiffs can not recover; otherwise they can recover for the loss sustained by them as the result of the unreasonable delay in the drilling of wells and the production of oil on their lands.

There are cases, prescribing the measure of damages for failure faithfully to prosecute developments on leased premises, not in accord with the views we have expressed. These are *Bradford* v. *Blair,* 113 Pa. 83, and *Daughetee* v. *Oil Co.,* 151 Ill. App. 102, affirmed 105 N. E. 308. These cases state the measure of damages to be as prescribed in plaintiffs' instruction. See also White on Mines and Mining Rights 235. The lease involved in *Bradford* v. *Blair* expressly re-

quired the lessee, after discovery of oil, "to continue with due diligence and without delay to prosecute the business to success or abandonment, and, if successful,. to prosecute the same without interruption for the common benefit of the parties"; and it presented to the jury the question as to whether defendant had been duly diligent. The measure of damages there prescribed was approved in the Illinois case. Without citing any authority therefor, White says only: "The measure of damages which the lessor would be entitled to recover for violation of the covenant to drill sufficient wells to properly test the land for oil would, ordinarily, be the rent or royalty which would have resulted to the lessor had the lessee complied with such covenant, and upon this question expert evidence would be competent as to the probable amount of, or whether any recovery should be allowed". In effect, he concedes that mere delay in drilling is not *per se* actionable. So *Howerton* v. *Gas .Co.*, 81 Kan. 553, holds that "the contract contemplated other wells should be drilled and operated with reasonable diligence to utilize the lease", and that "four years' delay under the circumstances shown was unreasonable". That was an equitable proceeding to cancel the lease for failure to exercise diligence in the production and marketing of gas. The case prescribes no measure of damages for delay in development.

Indeed, the very absence of reported cases prescribing such measure or standard for the ascertainment of damages readily leads to the conclusion that persons interested in the result of operations for mineral oils are disposed to accede to the judgment of the lessee exercised as to the diligence and extent with and to which such operations should be prosecuted. While there are many such leases and many developments under them, few actions based on delay in development have reached appellate courts of the different states. It is therefore reasonable to infer that lessors willingly defer to the judgment reasonably exercised by the lessee. The cases involving rights under such leases are ordinarily limited to inquiries as to forfeiture, abandonment, drainage, or fraudulent conduct on the part of the lessee resulting in delay of developments. Excepting the cases cited, we find none prescribing the measure of damages the lessor is entitled to re-

cover for non-development, and think the measure they pre-
scribe is not the proper one in cases of this character.  We
are not now speaking of what is the measure of damages re-
coverable for drainage through wells operated on other lands
near plaintiff's boundary line.  That question, as heretofore
observed, is not before us, the jury having said no such drain-
age had occurred.

But, surely, it would be grossly unfair to permit recovery
of damages to the extent allowed by the jury in this case.  It
scarcely is conceivable that plaintiffs have suffered such loss
from lack of wells on a tract of land containing only 100
acres.  To have that effect, the tract ˙must indeed be richly
productive of minerals.  At the rate ascertained for one-
sixteenth, the production from it would reach $112,000.  Con-
ceding that result remotely probable, or as ˙in any event
possible, are not plaintiffs still entitled to another sixteenth
from that quantity when produced?  If so, they will receive
twice the sum fixed by the contract as compensation for right
of exploration on their land.  The verdict is not for the share
of oil produced; it is damages for failure to produce.
Clearly, then, plaintiffs' share of the production is not the
true measure of the injury suffered.  To allow double˙ dam-
ages for the same breach of a contract silent on the subject
of compensation therefor is wholly irreconcilable with and
disproportionate to a due regard for justice and right.  We
can not conceive such result as reasonably possible under any
circumstances.  The proof shows no foundation for it.  In-
deed, no testimony justifies any such finding.  Plaintiffs may
not have suffered any loss.  None is shown, none proved.

The jury arbitrarily fixed the amount named.  It had not
the slightest evidence to support it.  How plaintiffs were in-
jured they do not tell us.  As said before, they limited the
inquiry to an ascertainment of the number of wells not drilled
which witnesses say they think defendant ought to have
drilled, a mere arbitrary conclusion.  Plaintiffs assumed the
burden of showing, by competent proof, the extent of the
injury to them resulting from delay in drilling under the
implied provisions of the lease.  Yet they made no effort to
produce any evidence on that feature of their case.  Not a
word spoken by them, or by any other witness, tends in the

slightest degree to show they suffered any damage from operations deferred. So far as disclosed, they have lost nothing more than interest on the value of productions obtainable had defendant exercised that degree of diligence we have suggested as due under certain condition and circumstances.

Moreover, additional wells may not produce an ounce of oil, or they may produce great quantities of it. If none, the lessee loses the cost and expense incident to the operation; if in paying quantities, the lessor obtains his share without expense. But, as the operator assumes all the risk and burdens of a hazardous business, and the lessor no risk, no burden, a verdict without merit because based on evidence wholly insufficient under any view of the case, can not and ought not to be permitted to stand as a foundation for the judgment rendered thereon.

We have said nothing regarding defendant's instructions, the admission of evidence, or the existence of the implied covenants in oil and gas leases; because what has been said virtually disposes of the first two, and no question is raised as to the other. The authorities uniformly concede the existence in oil and gas leases of covenants for protection against drainage and for the exercise of reasonable diligence in promoting production on the lands leased. *Brewster* v. *Zinc Co., supra; Jennings* v. *Carbon Co., supra.*

Being based on a wrong theory, the judgment is reversed, the verdict set aside, and a new trial awarded, to be governed by the principles herein announced.

*Reversed, and new trial granted.*


POFFENBARGER, JUDGE, *(concurring)*:

The claim for damages on account of alleged drainage wholly fails for want of proof. The opinion of the court concedes that, under circumstances, not established by the evidence in this case, the lessee, under a lease, such as the one involved here, containing no express covenant to drill additional wells or to operate the land diligently for oil, might recover damages for non-drilling of additional wells. Though some of our decisions contain dicta in agreement with this theory, *Hall* v. *South Penn Oil Co.,* 71 W. Va. 82 and

other cases there cited, I am of the opinion, after mature consideration, that there is no such right of action. It is not affirmed, as matter of decision, by any of our cases. What was actually decided is that the lessee has no remedy in equity, under such circumstances, and the observation that there is remedy at law, must be taken subject to a very important qualification, namely, if the plaintiff has any right to relief at all. Though these observations read as if the court has said there was such a right, they do not amount to decisions affirming it. Accurately expressed, the view was that, if the plaintiff had any right, his remedy for violation thereof was in a court of law.

The implied covenant on the part of the lessee to operate the lease and make it mutually beneficial to himself and the lessor has been affirmed, as matter of actual decision, only in cases involving the doctrine of abandonment. These cases say the lessee cannot hold on to the lease, after he has ceased operations thereon. He is under an implied covenant to make the lease productive and so beneficial to the lessor as well as himself. None of them undertake to say the implied covenant imposes duty to do more than make the lease produce oil or gas in paying quantities. Not one of them undertakes to say the lessee must make it beneficial in any certain degree. The degree of benefit or extent of production did not arise in any of them. In each there had been an actual, legal abandonment or such an abandonment was asserted, and the issue was whether or not the lessee had abandoned the lease and thus reinvested the lessor with possession and control of the leased premises for oil and gas purposes. *Parish Fork Oil Co.* v. *Bridgewater Gas Co.*, 51 W. Va. 583; *Steelsmith* v. *Gartlan*, 45 W. Va. 27; *Huggens* v. *Daley*, 99 Federal Rep. 613; *Munroe* v. *Armstrong*, 96 Penn. St. 307; *Conrad* v. *Morehead*, 89 N. C. 31; *Petrolum Co.* v. *Coal Co.*, 89 Tenn. 381.

Extension of this covenant, raised by necessary implication, for the purpose of testing the question of abandonment, was a natural error on the part of the lessors and their attorneys, due to the generality of the terms in which it was expressed. The lessor desiring something more than had ever been legally accorded him, readily and naturally siezed upon it as justification for his claim, and the court, having no occasion

either to affirm or deny its validity in the equity suits, in which it was presented, rather conceded it as mere matter of opinion, not decision, without inquiry as to the soundness of the claim.    Extension of the covenant cannot be justified upon the ground of necessity, arising out of the terms of the lease.    In cases of abandonment, there is such necessity, or there must be such a covenant, else the lessee gets from the lessor something for nothing.    There can be no such result as long as the lessee produces oil or gas in paying quantities. Such production makes the lease mutually beneficial.

Implied covenants can only be justified upon the ground of legal necessity.    Such a necessity may arise out of the terms of the contract or out of the substance thereof.    One absolutely necessary to the operation of the contract and the effectuation of its purpose is necessarily implied, whether inferable from any particular words or not.    It is not enough to say it is necessary to make the contract fair, or that it ought to have contained a stipulation which is not found in it, or that, without such covenant, it would be improvident or unwise or would operate unjustly; for men have the right to make such contracts.    Accordingly courts hesitate to read into contracts anything by way of implication, and never do it except upon ground of obvious necessity.    "All authority opposes construction, or the reading in of matter not expressed, when it is not rendered necessary in some way or for some reason." White v. Bailey, 65 W. Va. 573, 576; United States v. Fisher, 2 Cranch 358; Jackson v. Lewis, 17 Johnson 475; Turnpike v. People, 9 Barb. 161; Morgan v. Railroad Co., 96 U. S. 716.    In Hamlyn & Co. v. Wood & Co., 2 Q. B. 488, Lord Esher said: "I have for a long time understood that rule to be that the Court has no right to imply in a written contract any such stipulation, unless, on considering the terms of the contract in a reasonable and business manner, an implication necessarily arise that the parties must have intended that the suggested stipulation should exist.    It is not enough to say that it would be a reasonable thing to make such an implication. It must be a necessary implication in the sense I have mentioned."    In the Moorcock, 14 P. D. 64, Bowen L. J., said: "The implication which the law draws from what must obviously have been the intent of the parties, the law draws

with the object of giving efficacy to the transaction and prevent such a failure, of consideration as cannot have been within the contemplation of either side." In *Sterling* v. *Maitland,* 5 B. & S. 840, Chief Justice Cockburn stated the rule as follows: "I look on the law to be that, if a party enters into an arrangement which can only take effect by the continuance of a certain existing state of circumstances, there is an implied engagement on his part that he shall do nothing of his own motion to put an end to that state of circumstances under which alone the arrangement can be operative." This was quoted and approved by Kay, L. J. in *Hamlyn & Co.* v. *Wood & Co.,* 2 Q. B. 488. Bowen, L. J. said in *Oriental Steamship Co.* v. *Tylor,* 2 Q. B. 518, "The case comes within the well-known rule that where the contract as expressed in writing would be futile, and would not carry out the intention of the parties, the law will imply any term obviously intended by the parties which is necessary to make the contract effectual." In *Mackay* v. *Dick,* 6 App. Cas. (1881), 251, Lord Blackburn said: "I think I may safely say, as a general rule, that where in a written contract it appears that both parties have agreed that something shall be done, which cannot effectually be done unless both concur in doing it, the construction of the contract is that each agrees to do all that is necessary to be done on his part for the carrying out of that thing, though there may be no express words to that effect. What is the part of each must depend on circumstances."

The limitations upon the rule have been expressed in terms no less clear. Lord Esher said in *Butler* v. *Manchester, Sheffield and Lincolnshire Railroad Co.,* 21 Q. B. D. 207: "No Court has a right to imply any term as between parties which was not clearly and obviously within the contemplation of both parties." In *Hamlyn & Co.* v. *Wood & Co.,* Kay, L. J., said: "The Court ought not to imply a term in a contract unless there arises from the language of the contract itself, and the circumstances under which it is entered into, such an inference that the parties must have intended the stipulation in question that the Court is necessarily driven to the conclusion that it must be implied. To state the rule in any

wider terms would be going, I think, beyond what is justifiable on principle.''

This rule amply justifies recognition of an implied covenant to operate the lease and make it produce oil or gas in paying quantities. Otherwise the lessee would hold the lessor's land for nothing, a thing the parties could not possibly have contemplated. It is born of necessity that something be done under the lease. No such necessity underlies the claim of a covenant to take out the oil as fast as it is practicable or possible to extract it, for, as long as oil or gas is produced in paying quantities, the expectation of the lessor is measurably fulfilled. In the other case, it is not. This marks the distinction very clearly. As long as oil is flowing in paying quantities, the lessor derives a benefit. If the lessee leaves the premises and oil ceases to flow, the lessor gets nothing, and his land is held to no purpose, except the mere hope of speculative profit on the part of the lessee. While the oil flows in paying quantities, the letter of the contract is fulfilled. It provides that the lessee shall have the use of the premises for oil and gas purposes, for a fixed term, and as long thereafter as oil and gas is produced in paying quantities. That condition, production of oil or gas in paying quantities, is all the land owner expressly stipulated for. For all that anybody can see or know, he has relied, for further benefits and profits, upon the inducement which the land itself, as oil or gas territory, holds out to the lessee, assuming the sufficiency thereof to secure the drilling of as many wells as are profitable. Who can say with any degree of certainty he did not? How does it conclusively appear that he reserved the right to require more wells than the lessee should see fit to put down, or faster drilling than the lessee cares to do? Nothing in the terms of the lease or circumstances of the parties drives or forces the court to say he did either. The assertion thereof is mere speculation.

That such inducement is ordinarily sufficient is evidenced by the fact that the great oil fields of this state and of the country generally have been developed and completely operated, to the satisfaction of lessors, under provisions of this kind, construed as leaving to the lessee the determination of the number of wells and the time and place of drilling.

Under the thousands of leases taken in this form, complaints of lack of diligence on the part of the lessees have been rare. In only three or four instances, have lessors come to this court with complaints on grounds of refusal of the lessees to drill additional wells, and, in almost every such case, an effort was made to establish drainage as the real ground of relief. Such was the complaint in *Hall* v. *South Penn Oil Co.*, 71 W. Va. 82; *Ammons* v. *South Penn Oil Co.*, 47 W. Va. 610; *Harness* v. *Eastern Oil Co.*, 49 W. Va. 232; *Core* v. *Petroleum Co.*, 52 W. Va. 276; and, in this case, the principal grievance set forth in the declaration is the unsustained allegation of drainage. The meagerness of complaints of this kind strongly argues the sufficiency of the hope of profit to the lessee as an inducement to the drilling of additional wells. In most of these complaints, the territory was apparently worthless and the efforts were to compel the lessees to spend vast amounts of money on the mere hope of returns and contrary to their judgment. The hundreds of leases that have come into this court, in the course of litigation, are nearly all in the form of the one here involved, and this signifies the inability of land owners to secure such stipulations for development according to any prescribed standard. In a few rare cases, stipulations for additional wells to the extent of two or three or four have been found, but such instances have very seldom occured. The hazard, the risk is all on the part of the lessee. The land owner risks nothing except the use of his land. The oil business is extremely hazardous to the operator, wherefore it is not an easy matter to obtain a contract for additional wells. Such contracts are decidedly exceptional. Very few of them have ever been seen. The following observation of Mr. Justice Mitchell, dissenting in *Kleppner* v. *Lemon,* 176 Penn. 502, quoted with approval in *Core* v. *Petroleum Co.*, 52 W. Va. 276, accords with the incontrovertible facts: ''The lessee has to bear the cost of putting down wells, and his interest is to proceed carefully, with due regard to expense and probable returns, while the lessor's interest is to have search and experiment without regard to present cost. The decision in regard to such matters belongs primarily to the lessee. It is a proper subject for agreement, and when the parties have agreed what shall be done their rights are not subject to the

judgment of any court to fix a different standard.  If the parties to the present controversy had expressly stipulated that one well should be sufficient for the whole tract, no court would venture to enlarge the test by directing another to be put down at the lessee's expense, yet the covenant of the lease amounts to just that, as I understand the learned court below to admit.  I would reverse this judgment as a flagrant violation of the liberty and sanctity of contracts by raising a purely factitious equity to enable the complainant now to make a better bargain at the defendant's expense than he chose or was able to make for himself at the time.''

Having demonstrated inhibition of the proposed extension of the implied covenant by the limitations of the rule governing such covenants, I now apply two other familiar rules of interpretation, giving effect to the words of the contract and force to established customs and usages.  By the terms of the agreement, it is to continue as long as oil or gas is produced from the land in paying quantities.  This clearly negatives any implication of right in the lessor to require production in any greater quantity.  Compliance with that condition continues the estate in the lessee.  As long as it is complied with, the lessor cannot forfeit the lease. · *McGraw Oil Co.* v. *Kennedy,* 65 W. Va. 595.  For the same reason, we must say, to be consistent, he cannot require more than compliance with the prescribed condition, unless there is danger of loss by drainage.

This contract was made with full knowledge of the usage and custom of lessors under such agreements, to leave the locations and number of wells and times of drilling to the determination of the lessees.  It is an usage so general as to require judicial notice thereof.  Practically all of the tens of thousands of leases under which the vast oil and gas fields of this state have been developed have been made in the form of this one.  The lessors never so much as thought of the alleged right here asserted.  They left it all to the lessees, and, so interpreted and executed, these leases have adequately and fully protected the lessors and and effectuated full, complete and diligent development of their lands.  The interest of the lessee has been a sufficient inducement in almost every case.  It has been in this case.  This court so finds and decides.

An established usage known to the parties to a contract is a part of the contract, unless excluded by its terms. *Anderson v. Lewis,* 64 W. Va. 297; *Cobb* v. *Dunlevie,* 63 W. Va. 398; *Johnson* v. *Burns,* 39 W. Va. 658; *Governor, etc.* v. *Withers,* 5 Gratt. 24; *Hansbrough* v. *Neal,* 94 Va. 722.; *Richlands & Co.* v. *Hiltebeitel,* 92 Va. 91; Anson, Con. 246 *et seq.,* 2nd Ed. 322 *et seq.*