## CHARLESTON.

BLUE CREEK DEVELOPMENT COMPANY *v.*
GEORGE D. HOWELL *et al.*

(No. 5294)

Submitted April 28, 1925.   Decided June 8, 1926.

1.   CONTRACTS—*If Language of Instrument Leaves Parties in Doubt, Court Will Consider Occasion Giving Rise to it, Obvious Design of Parties, Object to be Obtained, as Well as Language of Instrument, and Construe it so as to Best Effectuate Real Intent and Meaning of Parties.*

If the language of an instrument leaves the meaning of the parties in doubt, the court will take into consideration the occasion which gave rise to it, the obvious design of the parties, and the object to be attained, as well as the language of the instrument itself, and give effect to that construction which will best effectuate the real intent and meaning of the parties.   (p. 758.)

(Contracts, 13 C. J. §§ 509, 514.)

2.   SAME—*Contract Arising From Implication Rests on Equitable Principle That One Person Shall Not be Permitted to Enrich Himself Unjustly at Expense of Another.*

And when a contract arises from implication, and not from consent, it rests on the law of natural equity, and upon

the equitable principle that one person shall not be permitted to enrich himself unjustly at the expense of another. (p. 759.)

(Contracts, 13 C. J. §§ 509, 514.)

3. MINES AND MINERALS—*Where, as in Oil and Gas Leases, or Contracts Allied and Connected Therewith, and Work of Development Contemplates Production of Oil or Gas, or Extraction of Gasoline from Gas, for Mutual Benefit of Parties, Each of Parties is Bound by What, Under the Circumstances, Could Reasonably be Expected of Operators of Ordinary Prudence, and Honest Judgment of One on whom Burden and Expense of Operations Rest Will Generally be Regarded as Conclusive of Parties' Rights.*

Where, as in leases for oil and gas or contracts allied or connected therewith, the work of development contemplates the production of oil or gas, or the extraction of gasoline from the natural gas produced, for the mutual benefit of the parties, each of the parties is bound by what, under the circumstances, could reasonably be expected of operators of ordinary prudence, having regard to the interests of both; and the honest judgment of the one on whom the burden and expense of operations rest will generally be regarded as conclusive of the rights of the parties. (p. 760.)

LIVELY, WOODS, JUDGES, absent.

(Mines and Minerals, 40 C. J. §§ 681, 760.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Appeal from the Circuit Court, Kanawha County.

Action by the Blue Creek Development Company against George D. Howell and another. From a decree dismissing its bill, plaintiff appeals.

*Affirmed.*

*Price, Smith & Spilman* and *Geo. E. Price,* for appellant.

*George D. Howell* and *Davis & Painter,* for appellees.

MILLER, JUDGE:

Plaintiff, by its bill and attachment sued out on the ground of their non-residence, sought to recover from defendants, trading as the Eastern Fuel Company, damages for the alleged breach of their contract to build and operate a gasoline

plant on what is described as the Brinegar tract of fifty acres, on which plaintiff owned a lease for the production of oil and gas, and to extract the gasoline from the casing head gas from four oil wells drilled on said tract, according to the terms stipulated in the contract, and which wells at the date of the alleged contract were being operated for oil by the plaintiff company.

By clause one (1) of the contract, dated April 7, 1917, it was provided as follows: "The First Party (Plaintiff) hereby sells and grants unto the Second Party (Eastern Fuel Company) *the right* of extracting the gasoline present from such casing head gas, and for such purposes the right to erect, maintain and use one or more gasoline extracting plants upon the surface of said leased premises in such manner as not to interfere with the First Party's operations thereon." This is the provision upon which defendants mainly rely in their defense, that the contract properly construed constitutes merely a right or license, at their option, to go upon the property and produce gasoline upon the terms of the grant or offer therein contained.

The third (3) clause, however, provides as follows: "It is agreed that *all the casing head gas which shall be produced* from the wells of the First Party shall be used and treated by the Second Party, and after such treatment and extraction of the gasoline therefrom the remaining gas shall be the property of the First Party."

By the eleventh (11) clause defendants were given the right to go upon the leasehold at points described, for the purpose of making a practical test of said gas for gasoline present, subject to the inspection and consent of plaintiff's engineer, without charge for the gas, such privilege to continue no longer than April 25, 1917, and to be concluded sooner if possible. And if such tests should prove satisfactory to the defendants, and they should decide to take under the contract, work on the construction of the gasoline plant should begin within fifteen (15) days from May 1, 1917, and the building operations vigorously prosecuted to a speedy completion, and the plant completed within one hundred and twenty (120)

days, subject to reasonable delays and accidents beyond defendants' control.

By the fourth (4) clause right was given defendants to erect and maintain their extracting plant or plants with ingress and egress free of rent, provided the plaintiff owned or controlled such rights in sufficient area, outside of the land used for its own purposes, to supply the need of defendants in that regard; also a pipe line right of way out to the railroad, over any land owned or controlled by plaintiff; and provided that the buildings of defendant should not be closer than 300 feet to plaintiff's buildings, and that all such buildings and rights should be subject to the restrictions contained in the insurance policies carried by plaintiff.

By the fifth (5) clause the plaintiff reserved the right, with the agreement of defendants, to disconnect any gas well or wells from the pipe line, on account of the abandonment thereof, or for the purpose of cleaning out or repairing the same, or for drilling deeper, or for drilling from the gas sand to the oil sands for the purpose of oil, or for the purpose of making repairs of any kind to the wells or pipe lines, and that the gas from any well or wells so disconnected, and while so disconnected, should be considered no longer under the terms and conditions of the contract, until original conditions should be re-established.

By the eighth (8) clause the second party agreed to put in such compressors as might be necessary to increase the pressure of the gas to such an extent as to produce the greatest amount of gasoline practicable therefrom.

By the seventh (7) clause the term of the contract was to be fifteen (15) years from its date, with the right of renewal by the second party for an additional five (5) years, upon terms to be mutually agreed upon.

As a consideration for the rights and privileges granted to defendants, it was provided by the tenth (10) clause that:

"10. The First Party is to receive from the Second Party as royalty, without cost or expense to it: (a) One-half or 50 percent gross of the gasoline produced at said extracting

plant or plants; but the said Second Party exclusively shall market the First Party's share with its own proportion of said product, and shall account to the First Party for the sale of its one-half and of the one-sixteenth hereinafter mentioned, of the gasoline produced each month at the price obtained by the Second Party f. o. b. cars at the railroad destination point selected by it, which price shall be 70 percent of the retail price of automobile grade of gasoline sold on Grant Boulevard, Pittsburgh, Pennsylvania, f. o. b. Pittsburgh; (b) and in addition thereto, one-sixteenth gross of the gasoline produced at said plant or plants, which last mentioned interest is due or payable to the said W. W. Brinegar as royalty to him for the casing head gas herein mentioned under an agreement between the said Brinegar and the said First Party; which one-sixteenth interest shall be sold and accounted for by the Second Party as herein provided, concerning said fifty percent interest above mentioned. Monthly settlements shall be made on or before the 20th of each and every month for the gasoline produced and sold during the previous month. Second Party's sale books shall be at all times open to inspection by the First Party to the end that the amount of gasoline sold and the price received therefor may be verified.''

We have thus quoted literally such provisions of the contract as seem to be vital, and have digested such other parts as seem to shed any light upon the construction that should be given thereto.

The bill alleges that on April 24, 1917, defendants notified plaintiff that they had elected to take under the contract, and that the same thereby became absolute and a binding agreement between the parties according to the terms thereof; that on the same day plaintiff acknowledged receipt of the notice, and agreed that the proposal thereby became an absolute and binding agreement between the parties; and that it exhibited with the bill copies of said acceptance, also a copy of the lease from Brinegar and wife for said land.

The bill further alleges that with a view of erecting their plant for extracting the gasoline defendants had acquired a tract of land from one Cavender near to or adjoining the

Brinegar tract, and in July 1917, had employed the Hope
Natural Gas Company to erect their plant on the Cavender
lot; and that pursuant to its contract the Hope company had
entered upon and hauled thereon a large quantity of material
and had purchased a large quantity of machinery for erecting
the plant, and were proceeding with the work, when, about
the .... day of August 1917, they were notified by defendants
to discontinue the work upon said plant, and no work was
thereafter done thereon; that subsequently, on plaintiff's de-
mand that the work should proceed, namely on September 25,
1917, defendants had notified plaintiff that they would not
build said plant, and refused thereafter to carry out the con-
tract; wherefore plaintiff had been damaged in the sum of
$30,000.00.

It is further alleged in the bill, on information and belief,
that at the time of the said contract the property was pro-
ducing at least 378,000 cubic feet of casing head gas per day
from which the gasoline could have been extracted, and that if
defendants had proceeded diligently they could and would
have produced at least two gallons of gasoline from each 1000
cubic feet of gas; that the volume of gas had not materially
diminished between the date of the contract and the date of
the suit, and that plaintiff was informed and believed that
said wells were then producing more than 300,000 cubic feet
of casing head gas daily, and that normally the wells would
continue to produce the same quantity of gas, or with slightly
diminishing volume, for a number of years, so that the supply
of gas sufficient to justify extraction of gasoline would not
be exhausted for at least five years yet to come.

The bill further alleges that the gasoline which could and
should have been extracted from said gas, as provided by the
contract, has been worth at least seventeen cents per gallon
when sold in the manner provided in the contract, and that
plaintiff's one-half thereof would have yielded at least $50.00
per day, aggregating to the date of the suit the sum of $7,-
500.00; and that for the refusal of defendants to operate said
property for five years from that time, it had thereby been
damaged in the further sum of $25,000.00.

The defendants both demurred to and answered the bill. They admit the making of the contract of April 7, 1917, but not the legal effect thereof as claimed by plaintiff; they admit the purchase by them of the Cavender lot for the purposes alleged, the beginning of the work of constructing the plant for extracting gasoline, and their notice to plaintiff of September 25, 1917, that they would not further carry out the contract, for reasons stated in their letter of that date, and forecasted in previous correspondence, and in which notice they proposed to release to plaintiff all their rights under said contract and to donate to it the Cavender lot and other rights.

And by way of defense defendants denied that said oil wells were in April 1917, or thereafter at any time, producing 378,000 feet of casing head gas from which gasoline could be extracted, but that then and at all times thereafter the production was much less than the quantity stated; that it was true that the plaintiff through its agents did then represent the production to be 378,000 feet per day, and furthermore represented that the gas contained from three to four gallons of gasoline per thousand cubic feet, and that relying on such representation, and without making but a cursory examination, defendants were induced to enter into said contract; that it was not true, as plaintiff had represented, that three to four gallons of gasoline per thousand feet of gas could be so extracted, and it was not true that even two gallons could have been extracted therefrom, but on the contrary not as much as three-fourths (3-4) of a gallon could have been so extracted; nor was it true as alleged that 700 gallons per day could have been produced from said gas; that by the most approved practical methods not as much as three-fourths of a gallon could have been extracted from each thousand feet of gas.

The answer further alleges that said wells will not continue to produce 300,000 feet of gas daily, or any substantially equal amount; that the erection of a plant for the extraction of gasoline from the diminished and diminishing production would result in a great loss, and not profit, to the defendants, and

would not be justified; that in addition to the erection of the plant, because of the remoteness of the property from any town or populous community or any railroad, houses for workmen would be required; and that because of the scarcity of water necessary to operate such plant, wells would have to be drilled, and even then the supply of water would be uncertain, and without which the operation of such a plant would be impossible, as to which the contract of April 7, 1917, is silent.

Respondents further allege that within the true intent and meaning of said contract, and as a condition precedent to the building and operation of said gasoline plant, it was then and thereafter necessary that plaintiff's property should produce a sufficient quantity of gas with a proper quantity or proportion of gasoline content satisfactory to defendants at all times; but that in September 1917, when they commenced their preparation to build, they became aware that there was neither gas nor gasoline content as represented by plaintiff sufficient to justify the building and operation of such a plant, of which they notified plaintiff, and of their intention not to do so; that upon tests being made, it developed that less than three-fourths of a gallon to one thousand cubic feet of gasoline could be extracted, which fact was communicated to plaintiff, who made no further test or effort to disprove the same, wherefore defendants declined to proceed further with the work of building the plant; and the respondents pray that plaintiff's bill be dismissed.

Much evidence was taken, pro and con, on the issues joined on bill and answer, with the result that the court below, by the final decree appealed from, entered June 12, 1924, being advised by the record, and being of the opinion and finding as a fact that at the time of the contract of April 7, 1917, and at the time of the discontinuance of the work of constructing the plant, there was not sufficient gas and gas pressure to operate such plant profitably, had the plant been completed, and that defendants acting in good faith in the exercise of their best judgment had the right to discontinue operations thereunder, wherefore plaintiff's bill should be dismissed.

It is conceded that the contract contains no express agreement that the defendants, after the completion of the contemplated plant to extract the gasoline, would continue to operate it for all time, or so long as the wells continued to emit gas, regardless of the financial consequences to them.  And the contract on its face discloses that the purpose and consideration on the part of both parties was the mutual benefits that might result to both, not to one of the parties alone.  The building of the plant and its subsequent operation by defendants involved the expenditure of thousands of dollars, with no corresponding outlay or obligation by plaintiff.  The contract, in its inception, was induced, as the record shows, by the representations of plaintiff or its agents, of a daily flow of a definite quantity of gas.  True, the contract contemplated a personal test to be made by defendants within the time specified; and plainly this was to verify, to some extent at least, whether the wells were then producing gas in quantity and gasoline in quality to justify the risk of the enterprise by defendants.  The evidence shows that they did cause a hasty test of the flow of the gas at one or two of the wells, but being pressed for time, they did not pursue the investigation further, and concluded they might rely with confidence on the representations of Hancock, secretary and general manager of the plaintiff company to one A. L. Carter, in a letter dated July 29, 1916, which was turned over to the defendants by Carter the latter part of the year 1916 or the first of 1917, knowing that they had become interested in the extraction of gasoline from natural gas by the Saybolt process in 1916, Carter also being interested in the gasoline business.  In the letter Hancock represented to Carter that the casing head gas from the wells on the Brinegar tract was very good in gasoline, testing from three to four gallons per thousand cubic feet.  This information, with the personal test of the open flow of one or two of the wells made by defendants in 1917, after taking the option on the property, and the representation made by one Cline, an oil field worker employed at the time by plaintiff, that a certain test of the same wells by a gasoline engineer for the United Fuel Gas Company, and by

Hapgood, another engineer and chemist, prior to the contract, both tests estimating a gas production of 250,000 cubic feet of gas per day, and based on these representations and relying on all this information, defendants say that they were persuaded that they would be able to get from three to four gallons of gasoline per thousand cubic feet of gas; whereby they were induced to undertake the work. However, culpable defendants may have been in not instituting and executing better tests before finally electing to take under the contract, is perhaps not very material. The evidence of the tests previously and subsequently made, show wide differences in the estimates. As represented by Hancock to Carter, in July 1916, the quantity and quality of the gas was sufficient to produce from three to four gallons of gasoline per thousand feet; and plaintiff's agent represented a production of 375,-000 feet per day, about the date of the contract. Hapgood's test in February showed a production estimated at 250,000 feet per day, and gasoline content only a gallon and a half per thousand feet. Later, and before and while the defendants were engaged in building the plant, these wells showed quite a decline in the production of gas, due, as plaintiff's witness Cline thought, to the fact that the South Penn Oil Company and other companies operating offset wells on adjoining and near by tracts had put in gasoline stations and had been using vacuum pumps, so as to exhaust the gas or reduce the pressure, on not only the wells offset, but on from forty to fifty other wells in the surrounding field; and in August 1917, the test made at the instance of the Hope Natural Gas Company showed an open flow of only 297,000 feet, and information was obtained that the territory adjoining and surrounding the Brinegar tract had been thoroughly drilled by other operators, and that the gas was being rapidly depleted by the use of vacuum pumps, that there was lack of water necessary to produce gasoline from gas, that there were no transportation facilities necessary to market the product, and that to go on and complete a plant under the circumstances would prove disastrous. That these conclusions were correct seems to have been proven by what

followed; for in November and December, after plaintiff had sold the property to E. D. Warren & Company in November 1918, the flow of gas had become very greatly diminished. Plaintiff sold the entire property to Warren & Company for $12,000.00, and had the income from the oil wells in the meantime, about $3,000.00, total, $15,000.00 in all for the property.

Moreover, it was shown by plaintiff's witness Hapgood, an expert engineer and producer of gasoline by the same method proposed by defendants, that in February 1917, he had proposed to plaintiff for his company three propositions; first, to buy the property outright and all interest for $15,-000.00; second, to take the gas at 8 1-2 cents per thousand feet; and, third, to operate the property for gasoline on the terms of one-half the net profits to plaintiff and the remainder to his company. It will be observed how different the latter proposition was from that covered by the contract with defendants. And on cross-examination Hapgood stated that but for the fact that his company owned and operated gasoline plants in the same vicinity and the economies that could have been observed in connection with the other operations, he doubted whether he could have operated with profit plaintiff's property, even on the much more favorable terms of his proposition. On his proposition the whole income first became liable for the cost of the operation; only the net profits was to be divided between the parties. Thus it appears what an improvident contract defendants' would have been if carried out upon its terms.

We emphasize the fact appearing in the contract, that plaintiff retained' control of the wells, to produce oil, or to abandon them, and also the right to the gas after the extraction of the gasoline, with no provision made for taking care of it after the process of extraction was completed.

How, then, should the contract be construed? The general rule is well established that "if the language of the instrument leaves the meaning of the parties in doubt, the court will take into consideration the occasion which gave rise to it, the obvious design of the parties, and the object to be attained, as well as the language of the instru-

ment itself, and give effect to that construction which will effectuate the real intent and meaning of the parties." *Southern Railway Company* v. *Franklin & Pittsylvania Railroad Company,* 96 Va. 693. Contracts which arise from implication, arise not from consent as in the case of true contracts, but from the law of natural equity. They rest upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. 13 C. J. 244 (§10) 3, note 65.

It seems to us that the contract involved here should be construed with reference to the rules of construction which we apply to leases for oil and gas, and as would be applied to the particular lease to which it is tied by the very terms of the contract sued on, and which are more applicable and work out greater justice than the more strict rules applicable to express contracts; for we recur to the fact that the promise or covenant relied on is not expressed, but one of implication, predicated on the agreement that all the casing head gas which should be produced from the wells should be used and treated. This provision we may assume, in the light of all the facts and circumstances, was simply intended as one against waste if operations were begun. It was certainly not intended or expressed that defendants should literally take and consume all the gas, for some was to be used by plaintiff for operating the wells for oil; and then plaintiff might by terms of the contract abandon the wells; and certainly it was not intended that the defendants should continue to extract gasoline as long as a single foot came from the wells, or from which a single gallon of gasoline could be obtained. If not, when could defendants cease to operate? Some limit must have been anticipated; but what limit? We do not think there can be any doubt, considering the nature of the understanding, that the operations were to continue only so long as the property, in the judgment of the defendants, could be operated with profit to both parties. That the defendants in this case exercised a sound and honest judgment in declining to go on with the construction of its plants, the record leaves us in no doubt.

And we think the rules' and principles applicable to oil and gas leases should be applied in the final disposition of the case. We will content ourselves, therefore, with the mere citation of those cases. *Grass* v. *Big Creek Development Co.,* 75 W. Va. 719; *Jennings* v. *Southern Carbon Co.,* 73 W. Va. 215; *Steel* v. *American Oil Development Co.,* 80 W. Va. 206; *Hall* v. *South Penn Oil Co.,* 71 W. Va. 82; *Core* v. *The New York Petroleum Co.,* 52 W. Va. 276, 283; *Urpman* v. *Lowther Oil Co.,* 53 W. Va. 501, 508. From these cases we deduce the following principle applicable here, that where, as in leases for oil and gas or contracts allied or connected therewith, and the work of development contemplates the production of oil or gas, or the extraction of gasoline from the natural gas produced, for the mutual benefit of the parties, each of the parties is bound by what, under the circumstances, could reasonably be expected of operators' of ordinary prudence, having regard to the interests of both; and the honest judgment of the one on whom the burden and expense of operations rest will generally be regarded as conclusive of the rights of the parties. These cases and others' that might be cited are clearly distinguishable from the cases relied on by plaintiff, such as *National Coal Co.* v. *Overholt,* 81 W. Va. 427, in that the court in the latter case was dealing with the unconditional covenants or guaranties of the lessee.

Our conclusion is to affirm the decree.

*Affirmed.*