## CONSOLIDATED GAS UTILITIES CORPORATION v. KEENER OIL & GAS CO.

Civ. No. 2644.

United States District Court
N. D. Oklahoma.

Nov. 29, 1950.

Conrad C. Mount, Oklahoma City, Okl., Monnet, Hayes, Brown & Bullis, Oklahoma City, Okl., for plaintiff.

Pinkerton & Wills, Tulsa, Okl., for defendant.

WALLACE, District Judge.

### Preliminary Statement.

By this suit the Court is requested to make a declaration of the contractual rights and duties of the parties, under a contract entered into on April 9, 1929. The contract permits the defendant to divert and process the natural gas flowing through a 14″ pipeline owned and operated by the plaintiff. A controversy exists because the plaintiff is desirous of purchasing, from a third party, processed gas and injecting that kind of gas into the 14″ pipeline which would render valueless the defendant's plant.

### Findings of Fact.

1. The plaintiff, Consolidated Gas Utilities Corporation, is a Delaware corporation, licensed to do business in Oklahoma. The defendant, the Keener Oil & Gas Company, is an Ohio corporation, licensed to do business in Oklahoma. This action involves an amount of money in excess of $3000.00 exclusive of interest and costs.

2. There is a genuine and present controversy existing between the parties concerning their mesne rights and duties under a valid, existing contract.

3. Plaintiff is a natural gas public utility engaged in the business of producing, purchasing, transporting and selling natural gas, both at retail at the burner tip and wholesale at the city gate, to other gas companies, and operates in Texas, Oklahoma, and Kansas. It is a natural gas company by the provisions of the Federal Natural Gas Act and a common purchaser of gas under the laws of Oklahoma. Plaintiff is the owner and operator of an interstate pipeline system, which has as its termini Wheeler County, Texas, and Lyons,

Kansas, and consists of a 14″ pipeline from Wheeler County, Texas, to Enid, Oklahoma and several smaller lines from Enid to Lyons, Kansas.

4. Defendant is engaged in the business of manufacturing gasoline, butane and propane mixtures from natural gas. Defendant is the owner and operator of a gasoline plant located near Butler, Oklahoma. This plant is operated for the purpose of taking and treating the natural gas flowing through the interstate pipeline described in paragraph three, *supra.*

5. On the 9th day of April, 1929, a contract, hereinafter termed the gasoline plant contract, was entered into by Consolidated Gas Utilities Company, first party, and Bartlett Gasoline Company, second party. The pertinent provisions of this contract are as follows:

"(3) That the first party owns and operates a pipeline system for the transportation of gas, within the States of Oklahoma, Kansas and Texas * * * that first party in preparing the natural gas handled by it, for more satisfactory use by the public, finds it desirable to dry the natural gas so handled * * *

"(4) That second party is desirous of undertaking to treat the gas to be hereafter handled or transported by first party through said pipeline system, by putting said gas through a gasoline plant (drying plant or extraction plant) to be operated by second party under the terms and conditions herein expressed. It is definitely agreed that this contract shall apply only to the 14″ line now owned and operated by first party, it being understood, however, that first party shall not construct any other lines which will by reason thereof decrease the average delivery of gas through said 14″ line to less than fifteen million feet per twenty-four hours.

"(7) That first party * * * shall permit the flow of gas passing through its pipeline system to be diverted through the plant of second party, so that second party may dry the gas handled by first party * * *

"(15) That first party shall not during the life of this contract construct or install any gasoline plant or other device except standard drips for the extraction of gasoline at any point before or ahead of the flow of gas through second party's plant as herein provided for, or allow anybody else to do so, except second party herein * * *

"(18) That if the gas passing through or handled by second party's plant becomes so lean in gasoline content or so deficient in quantity that by proper effort and with up-to-date equipment, construction and operation, second party is unable to operate such plant at a profit to itself, then the same may be abandoned and dismantled.

"(21) This contract embodies the entire agreement between the parties * * *

"(26) That this contract shall remain in full force and effect for a period of ten years and as long thereafter as said pipeline system is continued in use for transporting gas having a gasoline content, unless the contract shall be forfeited or cancelled by some breach thereof by one of the parties, or unless it shall be mutually rescinded.

"(28) That this contract shall be binding upon and inure to the benefit of the parties hereto and their successors, heirs, representatives and assigns * * *."

6. The gasoline plant contract was modified by letter agreement on May 1, 1941. The fourth provision of that agreement reads, in part, as follows:

"It is mutually agreed that paragraph numbered (4) of the contract dated April 9, 1929, be and the same is hereby amended to read as follows, to wit:

"* * * it is definitely agreed that this contract shall apply only to the 14″ line now owned and operated by first party, it being understood, however, that first party shall not construct any other lines to the Texas Panhandle Gas Field which will by reason thereof decrease the average delivery of gas through said 14″ line to less than fifteen million feet per twenty-four hours * * *."

7. The gasoline plant contract with modification, not herein material, has been and remains in full force and effect as of this date.

8. All of the rights and obligations of the gasoline plant contract are at present vested in the plaintiff, assignee of Consolidated Gas Utility Company, and defendant, assignee of Bartlett Gasoline Company.

9. In November, 1947, Shell Oil Company discovered what is now known as the Elk City Oil and Gas Field located in Beckham and Washita Counties, Oklahoma. The gas pool underlying the field is a separate and distinct geological formation from the producing area in the Texas Panhandle Gas Field. Shortly thereafter, plaintiff began negotiating with Shell and other producers for the purchases of gas in the Elk City Field. During the negotiation, Shell disclosed to plaintiff that it intended to construct a gasoline plant in the Elk City Field and as soon as the plant was put into operation only stripped gas would be available for sale and any contract must reserve to Shell the right to process the gas through its gasoline plant. Other producers refused to sell plaintiff wet gas because of their knowledge of Shell's plans to build the gasoline plant through which the parties could process their gas, using a portion of the residue gas for reinjection in connection with a pressure maintenance program. Plaintiff contacted defendant to ascertain whether a reservation by Shell of the right to process gas prior to the sale thereof to plaintiff would constitute a violation of the gasoline plant contract. Defendant took the position then and has contended to the present time that the injection of processed gas into the 14″ pipeline would constitute a breach of the gasoline plant contract. Subsequently, on August 6, 1949, plaintiff entered into an agreement with defendant whereby plaintiff could contract for the purchase of gas from Shell, but the contract provided that defendant's rights under the gasoline plant contract would not be prejudiced thereby. Thereafter, plaintiff and Shell entered into a gas purchase contract which became operative June 27, 1949. The contract, in part, provides:

(1) The plaintiff will construct at its own expense a gas transmission line and other facilities required to transport gas from the delivery point in the field to plaintiff's 14″ pipeline.

(2) Plaintiff shall purchase 20 million cubic feet of gas every day that Shell does not require the gas for its oil field operation.

(3) The expiration date of the contract is March 31, 1952, but the parties contemplate entering into a long-term gas purchase contract; however, if the parties have not entered into a new contract on or before October 1, 1952, Shell has agreed to reimburse plaintiff for building the gas transmission line. It is further stipulated that the reimbursement provision shall be eliminated unless on or before September 1, 1951, Shell is satisfied that plaintiff may purchase stripped gas.

10. The cost of Elk City gas to plaintiff for the period from November, 1949, through September, 1950, was in excess of what the Wheeler County gas in the same quantity and over the same period of time would have been.

11. On November 11, 1949, plaintiff completed the construction of a pipeline from the gas delivery point in the Elk City Field to its 14″ line, a distance of approximately 13.6 miles, provided dehydration and other facilities at a cost of $320,696.43, and such facilities are being used to transport Elk City gas from that field to the 14″ line.

12. Shell has commenced the construction of a gasoline plant in the Elk City Field capable of processing 100 thousand M. C. F. of gas per day which, in the absence of unforeseen delays, will be put in operation not later than January, 1951.

13. On December 12, 1949, plaintiff entered into an agreement with United Gas Pipe Line Company, whereby plaintiff agreed to sell United surplus gas that plaintiff had available in the Elk City Field and in the Texas Panhandle Field; also plaintiff agreed to transport gas for United from the Elk City Field to the Texas Panhandle Field through the 14″ pipeline. The termination date of that contract is March 31, 1952.

14. The amount of recoverable gas available to the plaintiff in the Texas Pan-

handle Gas Field is incapable of exact measurement but under existing conditions the field will be depleted within two years from the viewpoint of economically prudent production. This conclusion is based on the following factors:

(1) The average rock pressure had declined from over 370 pounds per square inch in 1929 to less than 40 pounds per square inch in 1950.

(2) Each gas well had an average open flow of over 36,000 M. C. F. in 1929 as contrasted to an average open flow in 1950 of 1,500 M. C. F.

(3) It was necessary for plaintiff to install six compressor stations since 1939 in order to inject gas gathered in the field into the main transmission lines.

(4) Some of the plaintiff's wells are making water, and other wells will probably start making water as normally a decrease in rock pressure results in an increase in water seepage into the gas wells.

(5) Gas produced in the East Panhandle Gas Field is subject to regulation by the Railroad Commission of Texas. The Commission has promulgated Rule 25 which restrains production of gas to twenty-five percent of potential capacity. Plaintiff has been authorized greater productive capacity but the amount and duration of the increase is subject to the dictates of the Commission.

(6) The plaintiff has increased the number of its producing wells from 11 in 1929 to 53 in 1950.

15. The capacity of plaintiff's 14" line from the Texas Panhandle Gas Field is approximately 39,500 M. C. F. per day. On peak requirement days it needs that amount of gas for the customers presently supplied from the 14" pipeline system. Plaintiff estimates that the maximum amount of gas which it will be able to obtain from the Texas Panhandle Field on future peak days is as follows:

| | |
|---|---|
| 1950–1951 ...... | 17,000 M. C. F. |
| 1951–1952 ...... | 10,000 M. C. F. |
| 1952–1953 ...... | None |

This estimate is reasonable and probable in view of present conditions in the gas field, which are detailed in section 14, supra.

16. Plaintiff has no interest in Shell Oil Company by virtue of stock ownership or otherwise. Shell's gasoline plant, now under construction, is not located upon any pipelines, facility, or land in which plaintiff has an interest.

## Conclusions of Law.

### I

■ The court has jurisdiction over this action.

### II

■ The complaint states a right to relief under the Declaratory Judgment Act, 28 U.S.C.A. § 2201. See Delaney v. Carter Oil Co., 10 Cir., 174 F.2d 314.

### III

■ The gasoline plant contract is a valid bilateral agreement which has created mutual rights and obligations. See Moran v. Standard Oil Co., 211 N. Y. 187, 105 N. E. 217.

### IV

■ The contract does not by express terms require the injection of unprocessed gas, or prohibit the insertion of processed gas into the 14" pipeline; however, a contract includes all implied provisions that are indispensable to effectuate the intention of the parties which arise from the language of the contract and the circumstances under which it was made, 15 O.S.A. §§ 171, 172; Wright v. Fidelity & Deposit Co., 176 Okl. 274, 54 P.2d 1084. If the act to be done by the party binding himself can only be done upon a corresponding act being done or allowed by the other party, an obligation by the latter to do so, or allow to be done, the act or thing necessary for the completion of the contract will be necessarily implied. J. D. Harms, Inc., v. Meade, 186 Wash 287, 57 P.2d 1052. Particularly is this true if money or labor has been expended in preparation by the party expressly bound to perform; Thebest Laundry & Cleaning Co. v. Duffy, 293 Ill. App. 252, 12 N.E.2d 235. The gasoline plant contract, however, expressly provides that the

694

entire agreement is embodied in the contract (paragraph 21) but in construing a contract, every part must be given effect, if practicable, 15 O. S. A. 157. The defendant's predecessor would not reasonably have expended money in building a plant in reliance on a unilateral contract that did not bind in any manner the plaintiff's predecessor. Such a construction would not give effect to the obvious purpose of paragraphs four and fifteen of the contract; indeed, it would taint the contract as void for lack of consideration. See Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214. The duration of plaintiff's implied obligations, however, is the pivotal issue in this action.

V

■ In construing the express or implied provisions of a contract, the mutual intention of the parties, as it existed at the time of contracting, should be given effect, so far as it is ascertainable and lawful.

■ The plaintiff's predecessor was a public utility primarily engaged in furnishing natural gas to the public. The Texas Panhandle Gas Field was the only source of supply for the 14" pipeline until 1948 and by the letter agreement of May 1, 1941, the parties disclosed an intent to confine the operation of the contract to the Texas Panhandle Gas Field. The parties must have anticipated that the Texas Field would eventually be depleted, necessitating the use of another source of supply. A geologist's report made prior to the date of the contract estimated the gas reserves underlying land owned by Consolidated at 94.9 billion cubic feet. This report was given to Bartlett prior to the building of the gasoline plant. An amount greatly in excess of that estimate had been recovered prior to the instigation of this action. The parties to the contract were aware of a probable future change of conditions because the agreement stipulates the primary term was for ten years and so long thereafter as gas with a gasoline content shall be transported. It was not the intention of the parties to require the continued production in the Texas Panhandle Gas Field if it would be economically unsound to do so; nor did

the parties intend to forbid the injection of dry gas into the 14" pipeline if prudent business judgment so dictated. See National Products Co. v. Magnolia Petroleum Co., 175 Okl. 596, 53 P.2d 669. Blue Creek Development Co. v. Howell, 101 W.Va. 748, 133 S.E. 699; Beeson v. Drake Oil Co., 83 W.Va. 32, 97 S.E. 414, 8 A.L.R. 414.

The recoverable gas in the Texas Panhandle Field is nearly exhausted. Plaintiff has to have a source of natural gas adequate to meet its immediate obligations as measured by peak day requirements. After January, 1951, there will be large quantities of processed gas in the Elk City Field available to plaintiff at a cost consonant with economically sound production. The evidence introduced at the trial disclosed that other sources of supply are either inadequate or at a distance which would make the cost prohibitive.

It was not the intent of the parties for the restrictive covenants to remain in force and effect under the circumstances existing at the present time.

VI

It is the conclusion of the Court that the gasoline plant contract, as of this date, does not prohibit the injection of processed gas.