HOFFMAN TRIMBLE *et ux. v.* HOPE NATURAL GAS COMPANY

(No. 8137)

Submitted May 13, 1936.   Decided June 20, 1936.

*Kemble White, A. F. McCue,* and *H. M. Garrett,* for appellant.

*Young, McWhorter & Young,* for appellees.

MAXWELL, JUDGE:

This is an appeal from a decree of the circuit court of Barbour County imposing certain requirements on the lessee in an oil and gas lease.

The suit is prosecuted by Hoffman Trimble and Willa B. Trimble, his wife, plaintiffs, against the Hope Natural Gas Company, defendant, and pertains to the gas production from a 156-acre tract of land in Barbour County, owned by Hoffman Trimble and operated for gas by the defendant. The production of gas is being carried on under an oil and gas lease which was executed by the Trimbles in 1925 to John C. Chidester, who assigned the same to the Grasselli Chemical Company, which company sold and assigned the lease to the defendant September 15, 1927. Along with the Trimble lease, the defendant acquired from the Grasselli Company the William L. Morrison lease of 98.8 acres, whereon the Grasselli Company immediately prior thereto had drilled a well which produced gas.

Subsequent to the completion of the Morrison well, and prior to the purchase by the defendant of the Trimble and Morrison leases, the defendant had made location for, and started to drill, a well on the Malissa Nutter farm of 74.4 acres under a lease which the defendant had acquired thereon for oil and gas development purposes. The Nutter, Trimble and Morrison lands adjoin.

Soon after the defendant acquired the Trimble and Morrison leases, Hoffman Trimble requested the defendant to drill on his land an off-set well to the Nutter well and an off-set to the Morrison well. Negotiations with the defendant not having proven satisfactory to the plaintiffs, they instituted this suit December 15, 1927. In their original bill, they alleged that the defendant was fraudulently draining gas from the Trimble land through the Nutter and Morrison wells. They prayed that the lease be cancelled or, if that could not be done, that "the covenants of said lease, express and implied, be specifically enforced by requiring the said Hope Natural Gas Company to drill two wells," off-set to the Nutter and

Morrison wells, respectively. A few days after the institution of this suit, and considerable time before the original bill was filed, the defendant made a location for a well on the Trimble land and proceeded at once to drill the same, bringing it into completion in the month of May, 1928. The defendant's answer to the original bill was filed in October, 1928. Depositions were taken both for the plaintiffs and for the defendant.

At April Rules, 1930, an amended bill was filed. The amendments deal particularly with the defendant's manner of operation of the said gas well number 7184. It is alleged that the well was not properly completed, in that a "pocket" was not drilled below the gas producing sand and that nitro-glycerine was not exploded in the gas stratum. Further, it is alleged that in the manner of operating said well and measuring the gas produced therefrom, the defendant is dealing unfairly and unjustly with the plaintiffs. The enlargement of the prayer is that the defendant may be required to drill a pocket below the gas producing sand and to shoot the well; that the defendant may be required to drill another well as an off-set to the Morrison well, and to fully develop and operate the plaintiff's 156-acre tract by drilling one well thereon "to every twenty acres, or at least to every forty acres"; that the defendant be required to account to the plaintiffs for gas produced in said well at the price at which the said gas is sold by the defendant; and that account be rendered to the plaintiffs on the basis of measurement of 14.4 pounds of atmospheric pressure plus 8 ounces. There was an answer to the amended bill by the defendant, and the taking of depositions proceeded.

By a decree entered January 5, 1932, the circuit court of Barbour County dismissed both the original bill and the amended bill at the plaintiffs' cost. The dismissal did not involve an adjudication of the cause on its merits. The trial chancellor adopted the course he took because the suit had been instituted within a quarter-annum period for which the delay rental had been paid by the lessee to the lessors under the terms of the lease. On

appeal, this court reversed the decree of the circuit court of Barbour County and remanded the cause for decision on its merits. *Trimble* v. *Gas Co.*, 113 W. Va. 839, 169 S. E. 529. We held that because fraudulent drainage was charged against the defendant, the plaintiff was not precluded from instituting the suit within a period for which delay rental had been paid. Subsequent to the remand and the taking of further testimony, the case was submitted for decision on the merits and was finally disposed of by decree of June 19, 1935. This appeal followed.

By that decree, the circuit court required the defendant,

(1) To drill the well on the 156-acre tract, designated as well No. 7184, deeper, "by drilling to it a pocket next below the Benson Sand to a depth below the bottom of the Benson Sand in said Well No. 7184, not less than twenty-five feet nor more than fifty feet."

(2) To shoot the said well in the Benson sand with not less than twenty nor more than forty quarts of nitroglycerine.

(3) To promptly and skillfully prepare said well for operation and to operate the same in such manner, and that it should not be "pinched" more than other competitive wells.

(4) To drill and complete and put in operation another well for oil and gas purposes on said 156-acre tract, approximately eleven hundred feet south of the aforementioned well and four hundred feet from the W. L. Morrison line, and that the drilling of the additional well should be commenced promptly and proceeded with diligently; that such well should be drilled at least twenty-five feet below the Benson sand and shot with not less than twenty nor more than forty quarts of nitro-glycerine, and that the well, if productive, should be put in full operation.

(5) To provide opportunity for Hoffman Trimble to have continued access to said well No. 7184 and to the

meter house thereto, and likewise to the additional well ordered to be drilled, and to its meter house.

(6) To pay to Hoffman Trimble the damages he has sustained for failure to drill a second well on his said land within a reasonable time after the drilling of well No. 7184, "to be computed on the settled production of the second well on said ,156-acre tract of land, herein decreed to be drilled and completed and operated."·

(7) To compute and pay royalty on the gas produced from the 156-acre tract on the basis of fourteen cents per thousand cubic feet of gas produced, the same to be measured at an atmospheric pressure of fourteen and four tenths pounds per square inch plus eight ounces, and that each item shall bear interest from the date it became due.

The Trimble, Morrison and Nutter wells produce gas from the Benson sand. This sand obtains its name from the owner of the farm, not far from the Trimble land, where this sand was first discovered as a gas producing sand of that general territory. For gas production it is a comparatively thin sand, having been found to be from 5 to 22 feet in thickness. It lies at variable depths of, about 4,450 feet below the surface of the ground. For West Virginia gas territory, the Benson is denominated a deep sand. The great bulk of natural gas produced in West Virginia comes from depths of 1,500 to 3,000 feet. Gas sands are characterized as of high or low porosity. A sand of high porosity is a loose sand permitting large cubical content of gas and easy movement and flow thereof. A sand of low porosity is characterized by compactness with a correspondingly small cubical content of gas, the movement and flow whereof is retarded in direct ratio to the degree of compactness of the sand. Generally speaking, gas wells of large volume and low rock pressure are drilled in sands of high porosity, and wells of smaller volume and higher rock pressure are obtained from sands of low porosity. The deeper sands tend to higher rock pressure. The Benson sand wells have high pressure and comparatively low volume.

The three wells under discussion (the Trimble, Nutter and Morrison) lie at the apexes of the angles of an approximate equilateral triangle. The Morrison well is the most southern; the Trimble well is 1242 feet therefrom on a course north seven degrees west. From the Trimble well to the Nutter well, there is a distance of 1266 feet on a bearing north fifty-two degrees, fifty minutes east. And from the Nutter well to the Morrison well, the distance is 1115 feet, on a course south ten degrees, thirty minutes east. The southern extremity of the Nutter land extends in a spearhead partly between the Trimble tract on the west and the Morrison tract on the east. South of the southern tip of the Nutter land, the line between Trimble and Morrison bears slightly east of south. The Nutter well is 427 feet from the Trimble line, and the Morrison well is 636 feet from Trimble, on a direct line with the Trimble well, and 393 feet from the Trimble land at the nearest point. The Trimble well is about 800 feet from the Nutter line and 607 feet from the Morrison line.

In the decision on the former appeal of this case, we said: "According to the bill filed in the present suit, however, the plaintiffs specifically aver that their gas estate is being materially depleted by the defendant through other wells in proximity thereto and owned by the defendant.

"Were there no elements of fraudulent drainage by the defendant of the gas under the plaintiffs' land, the payment of the rental would have destroyed the plaintiffs' right of suit. But according to the bill such is not the case. The plaintiffs not only allege facts which present a basis for equitable relief, but introduced evidence tending to sustain such charges. The chancellor did not pass upon the merits of the case. As we have shown, he should have done so. * * *

"And where, as at bar, the suit is based on allegations of fraudulent drainage by the lessee, the acceptance of delay rental by the lessor does not preclude him from coming into equity even within the period for which

the delay rental has been paid. Delay rental may not be employed as a cloak for fraud. Fraud vitiates everything. So, we hold simply that, such situation appearing from the pleadings at bar, the trial chancellor should decide the case on its merits."

The case was remanded for further proceedings in accordance with the principles set forth in the opinion. Therefore, on the remand, the sole questions to be considered by the trial chancellor were with respect to the alleged fraudulent drainage of gas from under the plaintiffs' land, and such matters as were or might be incident thereto, directly or indirectly. Thus there was necessarily eliminated from consideration the question of alleged inadequacy of development of the Trimble land, in so far as said matter stands independent of fraudulent drainage through the Nutter and Morrison wells.

The record is massive. It is much too large. Careful and painstaking examination thereof has convinced us that substantial portions of the evidence developed on behalf of the plaintiffs are either irrelevant or have inconsequential bearing on the issues involved. This has greatly increased the cost of the suit without corresponding assistance to either the trial court or the appellate court.

The chancellor did not specifically find by his decree that there was or had been fraudulent drainage of gas from the plaintiffs' land as alleged in their bill. However, in the written opinion on which the final decree was based the chancellor said: "The allegations and proof show with reasonable certainty that there was imminent danger of legal fraudulent drainage of gas in substantial quantities from the plaintiff's 156 acres at the date this suit was instituted on December 15, 1927, through the wells on the Morrison and Nutter farms and the location of the Nutter well by the defendant in the southwest corner of the farm shortly after the Morrison well was completed and before it acquired the Morrison lease is strong evidence that the defendant believed that material drainage was or would take place." It is to be

noted, however, that at the date of the institution of this suit the well on the Trimble tract of 156 acres had not been drilled. The case must be decided with that well included as an element. From the fact that there may have been imminence of danger of drainage at the time the suit was instituted, it does not follow that there was either drainage or threat of drainage after the Trimble well was drilled and put into production.

The gas royalty paragraph of the Trimble lease reads as follows: "It is further agreed that the royalty for gas wells that may be drilled upon the above described premises shall be one-eighth of the money received by the Lessee from the sale of said gas, it being understood that the price at which the same is sold shall be 14c per 1,000 cubic feet. First payment to be made within 45 days after well is turned in line and each thirty days thereafter." In the Morrison lease, there is a similar provision, requiring a $\frac{1}{8}$ royalty of gas. Under the Nutter lease, there is not a $\frac{1}{8}$ royalty of gas to be accounted for by the lessee to the lessor, but a flat annual payment of $300.00 for each gas well.

In support of their contention that the defendant is fraudulently draining their gas, the plaintiffs allege that it is being drawn out through the Morrison and Nutter wells, and that "the said lessee (defendant) is thereby saving development expenses and operating expenses and saving royalties, in fraud of your plaintiffs under said lease."

Witnesses were introduced by the plaintiffs who testified that in their opinion, the stated difference in distances of the said wells from the boundary lines is producing a situation whereunder the plaintiffs are placed at a disadvantage, and that a substantial amount of their gas is being taken out through the two neighboring wells as alleged. Witnesses for the plaintiffs further testified that in their opinion the defendant's failure to drill a pocket below the Benson sand in the Trimble well and to shoot the well, appreciably curtailed the gas production therefrom; also, that the defendant's practice of

maintaining a valve or gate partly closed on the Trimble well had the effect of retarding the flow of gas there-from and thereby prevented the well from delivering into the pipe line the full amount of gas which it was capable of delivering; that the failure to shoot the Trimble well had resulted particularly to the prejudice of the plaintiffs because both the Nutter and the Morrison wells had been shot, thereby augmenting and stimulating the flow of gas from each of them.

The question of drainage of natural gas through the strata that produce it is necessarily a question largely. of estimation and conjecture. Probably, the factor most largely entering into such equation is the porosity of the strata which produce the gas. Generally speaking, the more open and porous the sand, the farther the drainage.

Other factors may enter, such as a geological fault, abruptly terminating a stratum on an ascertained horizon, and then, too, a gas stratum may not be uniform in a given area; it may vary as to thickness and may even "pinch out." So that even though a territory may be referred to as a defined gas producing area, there are necessarily involved great elements of uncertainty, as is most forcefully demonstrated by the appreciable number of "dry holes" which are drilled by experienced operators in the gas fields. In this immediate field, which is of rather limited area as such matters go, there are six or more non-productive wells—either no gas in the Benson sand, or an inconsequential amount.

Much of the testimony on behalf of the plaintiffs with respect to the question of drainage seems to be based on the assumption that the gas in the Benson sand underlying the Trimble, Nutter and Morrison farms along the lines of their conjunction in the vicinity of the three gas wells, will flow freely in the direction of the nearest of the three wells. Such assumption is not warranted. It is a conjecture merely. In fact, there is in the record certain evidence which tends appreciably to disprove the assumption. The evidence is this: For the period of

about five weeks after the Trimble well was placed in production, the Morrison well was entirely out of commission, produced no gas, because of flooding from water which in some manner had found its way into the tubing of the well. There was no resultant effect upon the Trimble well in volume of production or rock pressure, or by the appearance of water therein coming through the gas producing sand or otherwise while the Morrison well was out of production, and after it was repaired no change was observed in the Trimble well.

Testimony herein as to full development may be considered only to the extent that it tends to throw light on the question of fraudulent drainage. There is testimony on behalf of the plaintiffs that full development of the territory involved would require a well to every forty acres of land. On this theory, if a forty-acre circle be thrown around each of the three wells, each circle will impinge on both of the farms on which the other wells are drilled. The circles overlap, each upon the other. As between Trimble and Nutter, the overlap is about three and one-half acres against Trimble. And as between Trimble and Morrison, there is a difference of overlap of about four and one-half acres against Trimble. On behalf of the defendant, it was testified that for the deep sand territory involved in this suit, the wells should not be nearer together than one well to every ninety or one hundred acres. It is urged by the plaintiffs that this is in effect an admission by the defendant that a well in the Benson sand will drain at least ninety acres. The radius of a ninety-acre circle is about 1117 feet. If a circle inclusive of said acreage be drawn around each of the wells, the circumference of the circle will come within a comparatively short distance of each of the other two wells. The overlap would be in large measure reciprocal, the difference in favor of Nutter and against Trimble being about ten acres, and the difference in favor of Morrison and against Trimble about nine and three quarter acres. Neither of these theories—forty acres or ninety acres to a well—discloses material disadvantages to the plain-

tiffs when due consideration is given to the comparatively large acreages which are involved, the inherent uncertainties presented, and the cost of drilling these deep sand gas wells. These wells cost about $17,000.00 each.

Generally considered, perhaps the ideal situation with respect to gas wells on adjoining lands of different owners would be for such wells to be located equally distant from the boundary line between the two tracts, thus, so far as surface lines are concerned, the parties would be on the same footing. But no one contends that this would presage equality in results attained. Operators engaged in the hazardous business of developing lands for oil and gas find that other elements must be considered besides the question of exactitude of distances from boundary lines. Geological formations must be taken into consideration; also, trends of production as indicated by other wells in the vicinity. If these or other factors indicate to a lessee that he should drill a well somewhat farther away from a boundary line than an opposing well on an adjoining farm, he is within a reasonable discretion when he adopts such course. If he acts in bad faith and for ulterior purposes, this line of reasoning would not apply. But, because an operator has located a well, such as the Trimble well herein involved, a short distance farther back from a boundary line than are the wells on neighbors' lands beyond the boundary line, it does not follow that such location was made in bad faith and for a fraudulent purpose. Whether there is in fact drainage of Trimble gas through the Nutter and Morrison wells to a greater extent that the Trimble well drains from the Nutter and Morrison tracts, is highly conjectural. In a close, tight sand such as the Benson there are strong probabilities against drainage for any considerable distance. But, if, for purposes of discussion, it be considered that there is drainage from the Trimble land, such drainage cannot, in the very nature of things, as demonstrated above, be of extended proportion. The gas producing business presents so many uncertainties and surmises about which there cannot possibly be exact knowledge, that the courts have readily

perceived the injustice which would be involved in exactitude of requirement with respect to off-set wells, drainage and full development. In order that a court of equity may properly exercise mandatory authority over a lessee where drainage is charged, the circumstances must be such as to establish pronounced likelihood that the rights of the complaining party are being materially prejudiced. The court may not act on a mere showing of probability of drainage of a nature incidental to the production of gas. It is because of the impossibility of obtaining exact knowledge in such situations, that the chancellor cannot inform himself with sufficient accuracy to enable him to balance the judicial scales with exceeding nicety and refinement. So, what the chancellor cannot do with reasonable certainty and precision he should not do at all. These statements involve nothing new. The underlying principles here employed have been recognized and applied in many cases. They may properly be accepted as settled rules of equity administration. In applying them in oil and gas cases it has been decided that to justify the exercise of judicial authority on account of drainage, it must be substantial. *Dillard* v. *Gas Co.*, 114 W. Va. 684, 173 S. E. 573; *Adkins* v. *Gas Co.*, 113 W. Va. 490, 168 S. E. 366; *Hall* v. *Oil Co.*, 71 W. Va. 82, 76 S. E. 124, 126. In the latter case, the court said: "Obviously there can be no implied covenant against the allowance of any drainage at all, however slight." The court further said therein that to sustain an allegation of fraud, it would be necessary to show drainage in a substantial sense in order to make a good bill for cancellation. Manifestly, the proof must attain like dignity. Possibilities of slight drainage must be deemed unavoidable incidents of the oil and gas business.

The foregoing considerations lead us to the conclusion that the geographical location of the aforesaid wells does not of itself indicate substantial drainage of gas from the Trimble land through the neighboring wells; and that on the basis merely of the physical location of the wells, the plaintiff is not entitled to equitable relief.

But the plaintiff says that in the light of the fact that

both the Nutter and the Morrison wells were shot in the Benson sand, the failure of the defendant to shoot the Trimble well accentuates the matter of drainage from the Trimble land and is further evidence of the alleged fraudulent intent of the defendant. Much evidence is adduced with respect to the advisability of shooting gas wells. Concededly, the practice of so doing has been general in the gas fields. On behalf of the plaintiffs, there is testimony of experienced operators that the practice is advisable, and that, in their opinion, the Trimble well should have been shot in order that it might be placed on a fair competing basis with the Nutter and Morrison wells. For the defendant, it is testified both by officials in its employ and by representatives of other producing companies that the practice is always attended with great hazard and is of doubtful expediency. Of the latter group of witnesses, M. C. Schneider, operating manager of the Pittsburgh & West Virginia Gas Company— a man of broad experience extending over many years— testified: "I do not consider it good practice to shoot those Benson sand wells. That is more of a habit than good judgment. There is more or less danger in shooting the wells. When you are shooting one of these wells, if it bridged in the casing that rock pressure would accumulate under the bridge before you could get the bridge knocked out, and after that rock pressure has accumulated under the bridge to run the tools on there to knock that bridge out, there isn't any doubt in my mind but that you would get into fishing job and plug the well before you would get through with it, and there is danger of blowing up the casing when the shot goes off." The shooting of a gas well in the pay sand does not increase the amount of gas therein. At best, it merely eases or facilitates the flow of gas into the aperture which is called the well. The evidence shows that results in different gas wells have been extremely variant. In some, the stimulation of production has continued over a period of many months, while in others, the wells have settled down within a few weeks to about the same

production which they showed before they were shot; some even below the initial production.

Inasmuch as the close-by wells of Nutter and Morrison were both shot in the Benson sand, appearances, at least, would have been better had the same practice been followed with reference to the Trimble well. The situation was likely to arouse the suspicion of the Trimbles who, as careful, prosperous and thrifty people, were properly jealous of their property rights. If the defendant's time-honored custom of shooting gas wells had proved to be unjustifiable, it seems a little unfortunate that some other set of circumstances were not adopted for departure from the practice. But, in the light of the evidence on the subject, a court of equity would not be warranted in holding that the failure to shoot the Trimble well is evidence of fraudulent purpose on the part of the defendant to drain the plaintiffs' gas out from under their farm through wells on adjoining lands.

The Benson sand in the Trimble well is six feet thick, in the Nutter eight feet and in the Morrison ten feet. When tested in September, 1929, the Trimble well, shut in seven hours, showed a rock pressure of 550 pounds; the Nutter well, shut in thirty hours, a pressure of 810 pounds; the Morrison well, shut in eight hours, disclosed a pressure of 950 pounds. From the Morrison well, the initial production was 143,000 cubic feet of gas per twenty-four hours; after the well was shot, the production was at the rate of 393,000 cubic feet. The increased production continued for a period of months until the well was drowned out by water. After the well was repaired it resumed the production of gas, but on a much decreased basis. The initial production of the Nutter well was 248,000 cubic feet, and after the well had been shot, the production was increased to 1,025,000 cubic feet. The settled production of the Nutter well has not been ascertained inasmuch as there is no meter on the well, the lessor being compensated by a lump sum paid annually and not on the basis of gas production. The initial open flow test of the Trimble well showed a volume

production of 280,000 cubic feet per twenty-four hours. It appears from the record that generally the Benson sand wells which were shot showed as a result thereof marked stimulation of production. There was an average increase of about one hundred and forty per centum. This seems to establish that a gas well which has been shot will produce gas with greater acceleration, but such proof does not, in our opinion, show that by reason of having been shot a well will produce more gas. We are not familiar with any principle recognized by the courts which would entitle the plaintiffs to the quickest possible return from their gas well.

A pocket in a gas or oil well is the extension of the bottom of the hole below the lowest producing stratum. Pockets vary in depth. Ordinarily, they are at least of the length of a bailer which is about twenty-five feet long. The purposes of a pocket are to render it certain that the pay stratum has been drilled through, and to catch water and debris and protect the mineral producing sand therefrom. Where a well is to be shot, it is customary to drill a pocket, otherwise, it is a matter of expediency as to which operators differ in their opinions. Where, as with the Trimble well, there is a minimum of moisture there is less reason for a pocket. Since we have reached the conclusion that the evidence does not warrant the mandate that the defendant shoot the Trimble well, it follows that there is no justification for the requirement that a pocket be drilled.

Matters pertaining to the drilling of oil and gas wells, and to the producing of oil and gas are primarily within the sound discretion of the operator. It is he who carries the hazard, and the burden of the cost. As long as his procedure is in accord with standard methods he will not be interfered with by the courts. It is only when it seems evident the procedure adopted by him is clearly prejudicial to the rights of the lessor, that he (operator) will be required by a court of equity to do otherwise. *Allen* v. *Oil Company,* 92 W. Va. 689, 115 S. E. 842; *Adkins* v. *Gas Co., supra.* The same rule obtains

in actions at law for damages for failure properly to develop what is considered to be oil or gas producing property. *Grass* v. *Development Co.*, 75 W. Va. 719, 84 S. E. 750, L. R. A. 1915 E, 1057.

The keeping of the gate or valve of the Trimble well partly closed so as to retard the flow of gas therefrom into the line which carries it to market is complained of by the plaintiffs. They insist that although an operator may have that right and privilege when producing gas from a well on a flat rate of fixed annual payment, such right does not exist where under the terms of the lease, the landowner is to be compensated on the basis of an agreed portion or percentage of the volume of gas produced. Though the lease here involved is silent on this point, the lessors take the position that they are entitled to have the well operated by the lessee on the basis of the full capacity of its production. For the defendant, in support of the practice of "pinching" the wells, there is testimony that throughout at least the warm months of the year, it does not have market for all of its gas, and that it is necessary for it to retard production generally from its wells through such periods, and that it would not be fair and just for the defendant to take the full volume of production of the Trimble well to the prejudice of other lessors; and it is testified for the defendant that it is not in accordance with the best methods of operating a gas well to permit it to flow unrestricted into the delivery line; that a moderate back pressure in the well tends to resist the encroachment of water and to prolong the productive life of the well; also, it tends to prevent gas from congealing at the gate, which it is likely to do if there is sudden and pronounced reduction in pressure. Further, it appears from the testimony of the superintendent of the defendant's West Virginia production that the Trimble, Nutter and Morrison wells are all being operated in exactly the same manner. He testified that special tests made on these wells disclosed that, on an average, they produced only ten per centum less gas with gates "pinched" than when wide open. In the

light of all of which, there seems to be no basis on which we would be warranted in adjudging that the plaintiffs are entitled to require of the defendant that it permit the gas to flow from their well without restriction. We interpret the one-eighth gas royalty clause of the plaintiffs' lease to mean that the operator shall pay such royalty on the basis of gas taken from the well in accordance with approved and general methods, and, of course, there is an implied covenant that the lessors shall not be discriminated against in favor of somebody else. We would not be justified by the record in attempting to adjudge that the plaintiffs have suffered prejudice because of the "pinching" of their well.

The requirement of the trial chancellor that the defendant drill another well on the plaintiffs' land is not well grounded, in our opinion. The matter of further development, as such, has no place in this case. See ante, and former opinion in this case. As already noted, the only sufficient reason there could be for such requirement under the status which has heretofore been determined for this case, would be that such well is necessary to protect the plaintiffs' land from fraudulent drainage through the Morrison well. Hereinabove, we have considered the matter of said alleged drainage, and have ascertained that the evidence does not show that such drainage exists in appreciable degree. It follows that the trial chancellor's requirement in respect of the drilling of an additional well cannot be sustained.

There is a requirement in the decree appealed from that the defendant "do provide opportunity for continuous access to said well No. 7184 and the meter house thereto and meter therein measuring the gas therefrom * * *." This requirement was made evidently on the theory that the defendant had been fraudulently reporting the measurements of the gas produced from the Trimble well. Inasmuch as, in our opinion, the evidence does not sustain the theory of actual fraud on the part of the defendant, or the implication of fraudulent measurements or fraudulent reports of measurements, we can-

not affirm this requirement that the defendant permit the plaintiff, Hoffman Trimble, in person or by representative, to have continuous access to the said well and meter house. This court assumes that the operations on the Trimble land may be carried forward in a spirit of amity such as is indicated by the following statement of the defendant's superintendent made in answer to a question on cross examination. "Mr. Trimble is perfectly welcome to visit any of these wells' meter house at any time with any of our employees and make any observation, that he cares to make. Also, if Mr. Trimble wants to look to anything essential and gives reasonable notice in time, we will be very glad to see that he has an opportunity to make the inspection."

The trial chancellor's finding that the plaintiff, Hoffman Trimble, is entitled to damages from the defendant for failure to drill a second well on the 156-acre tract and for failure to shoot well No. 7184 within a reasonable time, cannot be upheld on the theory that there has been fraudulent drainage by the defendant of the plaintiffs' land, because, as stated above, the evidence does not afford basis for such finding. Nor can the matter of damages be sustained on account of failure to drill an additional well for further development, because, as already explained, the question of further development is not involved as a primary element of this case.

The defendant assigns as error the requirement of the trial court that royalty accrued and to accrue from gas production on the 156-acre tract shall be computed at fourteen cents per thousand cubic feet of gas on the basis of atmospheric pressure at 14.4 pounds per square inch, plus eight ounces, and that the defendant do pay interest on each item of royalty from its accrual date until paid. The defendant contends that the measurement of the gas should be on the basis of atmospheric pressure of 14.7 pounds per square inch, plus ten ounces. The lease involved does not prescribe the pressure for measurement of the gas. The average of atmospheric pressure at sea level is 14.7. It appears without con-

tradiction from the evidence herein that the mean atmospheric pressure in the gas fields of West Virginia, being several hundred feet above sea level, is 14.4. In the formula, the ounces added to the atmospheric pressure cover the pressure necessary to cause the gas to flow in the pipes. It is in evidence that many of the contracts of purchase of gas by companies dealing in that commodity specify that the purchase measurement shall be on the basis of 14.7 plus ten ounces. There is no evidence tending to establish that the contract herein was made in the light of a trade custom establishing such mode of measurement. The employment of sea level atmospheric pressure plus ten ounces in measuring plaintiffs' gas, instead of using the average pressure of the West Virginia gas fields plus eight ounces, would operate to the disadvantage of the plaintiffs to the extent of about two and eight-tenths per centum of the gas measured. In this matter of measurement, we find that there is no basis on which to sustain defendant's contention. We think, on principle, that the trial chancellor was correct in his finding on this item, and both his judgment and ours are bulwarked by the statement in a letter written to Hoffman Trimble by an authorized representative of the defendant November 27, 1928. This letter was in response to a written inquiry by Trimble as to the barometric pressure employed by the company in determining the volume of the royalty gas. In the reply letter there is this statement: "Measurement is based upon 8 ounces above an atmospheric pressure of 14.4 pounds * * *". The Trimble royalty should be calculated on this basis for each month since production from the Trimble well began, and, except for the monthly payments that were so calculated, interest should be computed on each month's royalty from the date the payment thereof to the plaintiffs became due under the lease. The royalty payments heretofore tendered by the defendant to Hoffman Trimble were refused by him and the checks were returned to the company. The defendant's contention that because it tendered said payments it should not be required to pay interest thereon, is not well taken be-

cause those payments, except possibly a few at the outset, were calculated on the erroneous pressure basis explained above.

The plaintiffs cross-assign error in respect of the trial court's finding that the basis of the royalty owing by the defendant to the plaintiffs is fourteen cents per thousand cubic feet. It will be remembered that the lease provides that the royalty shall be "one-eighth of the money received by the Lessee from the sale of said gas, it being understood that the price at which the same is sold shall be 14c per 1,000 cubic feet." The plaintiffs take the position that this should be interpreted to mean that they are to be paid as royalty one-eighth of the money received by the lessee from the sale of gas produced from their land, the price therefor in no event to be less than fourteen cents per thousand cubic feet. We are of opinion that so to interpret the gas royalty provision would, in effect, involve the writing thereof anew by the court. Courts cannot make contracts for litigants, nor write into contracts new words having the effect of changing the meaning from that which the words employed by the parties indicate. The gas royalty provision as it appears in the contract is composed of two clauses. The first clause standing alone would fix the royalty at one-eighth of the money received by the lessee. But the second clause, separated from the first only by a comma, is by way of definition, and for the purpose of removing all uncertainty and of prescribing a definite basis, thereby explaining the first clause. In our opinion, the effect of the second or limiting clause is to make the basis certain, namely, 14c per thousand cubic feet. Hoffman Trimble testified that at the time of the execution of the lease in 1925, it was his understanding from conversations had with the lessee named in the lease that the gas royalty provision meant that the lessors should be paid a royalty of one-eighth of the money received by the lessee or his assigns from the Trimble land, and that the price should not be less than fourteen cents per thousand cubic feet. This testimony was plainly incompetent. In determining the meaning of language employed in a written instru-

670

ment, courts must consider the words themselves in the light of the whole instrument. Collateral matters may sometimes be considered, but the impressions of one of the parties as to what the words meant when they were employed in the writing have no place in settled rules of interpretation. In such situations the verbal declarations of the parties to the contract must be excluded. *Crislip v. Cain,* 19 W. Va. 438, Syl. 13; *Caperton* v. *Caperton,* 36 W. Va. 479, 15 S. E. 257; *Scraggs* v. *Hill,* 37 W. Va. 706, 17 S. E. 185. The following general statement is pertinent: "It is not within the function of the judiciary to look outside of the instrument to get the intention of the parties, and then carry out that intention regardless of whether the instrument contains language sufficient to express it; but their sole duty is to find out what was meant by the language of the instrument." 6 Ruling Case Law, p. 835. We therefore approve the circuit court's finding that the gas royalty basis as fixed by the contract is fourteen cents per thousand cubic feet of gas.

In the light of all that is above written, we reverse the circuit court's decree of June 19, 1935, in all particulars, except as to atmospheric pressure basis of measurement, the rate per thousand cubic feet of gas, and interest. In these particulars, we affirm the decree, with the qualification that interest shall not be computed on any royalty payment which was correctly calculated in accordance with this opinion.

The case is remanded for further proceedings not at variance herewith. The defendant (appellant), having substantially prevailed on the appeal, will be awarded costs.

*Reversed in part; affirmed in part; remanded.*