**RED JACKET OIL & GAS CO. v. UNITED FUEL GAS CO.**

No. 5287.

Circuit Court of Appeals, Fourth Circuit.

Nov. 13, 1944.

Homer A. Holt and James M. Guiher, both of Charleston, W. Va. (Landon C. Bell, and Wm. B. Hogg, both of Columbus, Ohio, and Thomas B. Jackson, of Charleston, W. Va., on the brief), for appellant.

Robert S. Spilman and Bernard J. Pettigrew, both of Charleston, W. Va., for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Red Jacket Oil and Gas Company (hereinafter referred to as Jacket), as seller, and United Fuel Gas Company (hereinafter called United), as buyer, entered into a contract for the sale of natural gas. Jacket instituted a civil action in the United States District Court against United for alleged breaches of this contract. The complaint asked for damages, an accounting and an injunction restraining further contractual breaches by United.

The case was referred to a master, who made elaborate findings of fact and conclusions of law. When the case came before the District Court on objections to these findings and conclusions, the District Court entered judgment dismissing the action. Jacket has duly appealed.

Those parts of the contract of sale between Jacket and United which we consider to be of importance on this appeal are Paragraphs Third and Fourth, which read as follows:

"Third: The lands embraced in Seller's lease, hereinbefore referred to, and covered by this contract, lie within what is known as the Mingo and Wayne Counties, West Virginia, gas fields, and comprise a part of those fields. Said fields shall, for the purpose of this agreement, be known as the Mingo-Wayne Gas District, and it is contemplated and agreed by and between the parties hereto, that so long as this agreement remains in force, all gas delivered into Buyer's lines, from said district including that produced by Buyer from lands on properties owned or controlled by it, shall be delivered and accepted under equivalent conditions and on equal terms, with reference to all important factors such as head or line pressure against which Seller's gas or other gas from said district is delivered, and the means by which gas is introduced or forced into Buyer's receiving lines. That is to say, that Seller shall at no time be discriminated against, or placed at a disadvantage, actually or relatively, as compared with any other producer of gas in said district, including the Buyer, making deliveries of gas into Buyer's receiving line or lines, by being required to deliver its gas to Buyer against a higher pressure or against any discrimination whatsoever; nor shall Buyer allow other producers in said district to force their gas into Buyer's receiving line or lines by Compressors, Boosters, Pumps or other artificial means; nor shall the Buyer force gas produced by it into its own lines, by such means, unless employed in such manner as to work equally and fully to the aid and advantage of the Seller. It is agreed and understood, however, that Buyer may, at its option, erect or acquire, and maintain and operate, a Booster station in said district, through which Seller's gas and all other gas (including that produced by Buyer) received by Buyer from said district, shall pass on equal terms and under like conditions as to pressure, into Buyer's receiving lines.

"Fourth: It is mutually agreed between the parties hereto, that during the continuance of this contract Buyer will, during the winter months, beginning November 1st and ending April 30th of each year, accept, receive and pay for all of the gas which Seller is able to deliver and does deliver into Buyer's receiving line or lines in accordance with the terms of this contract; but during the summer months, beginning May 1st and ending October 31st, Buyer shall only be required to take only

one-third of the volume of gas that was taken during the preceding six months; and it is further understood and agreed that the said volume to be so taken in said six summer months may be taken throughout each and every day, by partially closing gates and other similar means to reduce the flow to the required capacity, or it may be taken by using the well or wells one-third of the time during such summer months, or in any other manner, so that the required quantity of gas be taken. It is agreed that in the event the pressure of gas from Seller's gathering lines becomes so high as to endanger Buyer's lines, then Buyer may choke back the gas to the point of safety."

The district with which we are concerned lies in Mingo and Wayne Counties in West Virginia, popularly known as the Breeden Gas Field. Gas from this field is transported to market through line V, a sixteen-inch pipe line owned and operated by United, running approximately West from Chapmanville to Kermit. The functioning of this line is controlled by a compressor station at Kermit, 13 miles West of the gas field. In the absence of artificial or mechanical controls, line V controls the pressures in the Jude Branch line and the Kirk Branch line and the production of the gas wells feeding into these lines.

United owned and controlled this Jude Branch line, (a six-inch pipe line) extending in a general northerly direction from line V. This Jude Branch line received, and delivered into line V, the gas from a number of United's gas wells, also the casing-head gas from oil wells, known as the Slick Rock Wells, owned by United.

Under the instant sales contract, United agreed to construct, and did construct, an eight-inch pipe line to receive the gas from Jacket's wells. This line, the Kirk Branch line, connected with the V line at a point about three miles West of the intersection of the Jude Branch line and line V. All of Jacket's wells, and a number of other wells, were connected with this Kirk Branch line.

The three principal factors which determine the quantity or volume of production from a gas well are line pressure, rock pressure and open flow. The line pressure, or pressure in the pipe line, must be lower than the rock pressure, if there is to be any production from the well, for natural gas tends to flow to the point of least resistance, i. e., the point where the pressure is lowest. Rock pressure is the amount of pressure under which the gas is contained in the gas-bearing sands or strata; and this rock pressure tends toward a gradual decline as production proceeds. Open flow indicates the volume or rapidity of the flow of gas from the well when the well is open, and the discharge of the gas from the well is not restrained or restricted by line pressure. Among the factors which determine the open flow is the porosity of the strata in which the gas is contained.

A compressor has thus been described:

"A compressor station consists of gas-driven compressors, with all necessary cooling systems and appurtenances, for taking gas from the field or incoming gas lines, *at a low or natural pressure*, compressing and delivering it at a higher pressure to outgoing lines, in order to overcome the friction in the line en route to the next compressing station or to the market." Diehl on Natural Gas (1927, 1929 reprint) at page 323.

Again, id. page 20, it is stated:

"The gas enters the line *at natural pressure* and flows to the intake of the station, where it is compressed and discharged at a pressure sufficient to transmit the same quantity many times the distance it would flow at natural pressure if the station were omitted."

Or, to state the same idea in terms of normal function, the compressor picks up the gas on the inlet side at the pressure at which it arrives by virtue of rock pressure and the compressor then forces the gas out into the line at a pressure which exceeds the line pressure.

We now proceed to determine, and to discuss briefly, the more important questions raised in this appeal.

(1) *Drainage.*

In the early stages of this proceeding, Jacket laid great stress on drainage. Now it is conceded by both Jacket and United that the question of drainage is completely out of the picture.

(2) *The Jude Branch Compressor.*

The Master found that the operation of the Jude Branch compressor by United (which was discontinued on May 1, 1940, at the request of Jacket) was a technical violation of the sales contract, but

that Jacket offered no adequate proof of any damage to Jacket resulting from the operation of the compressor. The District Court held that since Jacket offered no objection to the Master's finding of no adequate proof of damage here, this finding of the Master would be adopted by the Court. We take a like view. Even had Jacket made suitable objection to this finding, we are convinced that this finding of the Court should be upheld by us. Federal Rules of Civil Procedure, rules 52(a), 53(e) (2), 28 U.S.C.A. following section 723c.

### (3) *The Kirk Branch Regulator.*

■ The Master found that very late in December, 1931, or very early in January, 1932, United began to use a regulator on the Kirk Branch line. This regulator was removed in July, 1933. And again the Master found this to be a technical violation of the sales contract. But he also found that no adequate proof of damage had been offered by Jacket. The District Court adopted the Master's findings of fact but declined to pass on the liability of United on the ground that Jacket had filed no suitable objection to the Master's findings. Again we agree with the District Court and once more we hold that, even upon suitable objection by Jacket, this finding should be upheld. Federal Rules of Civil Procedure, Rules 52(a), 53(e) (2).

### (4) *Discriminatory Line Pressures.*

■ It was further found by the Master that the operation by United of the Kirk Branch Regulator and a gate-valve on the Jude Branch line served to equalize pressures on these two lines, (the Kirk Branch line and the Jude Branch line); that there was some discrimination in line pressures which was inequitable and disadvantageous to Jacket and thus violated the spirit of the sales contract. But the Master further found that there was no adequate evidence in the record to sustain a finding of any resulting damage to Jacket.

The District Court adopted the Master's findings of fact but declined to pass on the question whether there was any violation of the contract upon the ground of the Master's findings of lack of evidence to support a finding of damage to Jacket and Jacket's failure to object specifically to this finding.

Here again we sustain this ruling of the Court upon the same bases above set forth as to the Jude Branch Compressor.

### (5) *The Slick Rock Compressor.*

This brings us to what we believe to be one of the two most important issues before us.

The apposite findings of fact by the Master as to the Slick Rock Compressor may be thus briefly summarized: United, over Jacket's protest, operated this compressor from May 1, 1931, throughout the damage period; gas from United's oil wells (known as casing-head gas), which had hitherto been allowed to escape, was thereby pumped from these wells at a rock pressure of from four to five pounds into the Jude Branch line at a pressure of seventy-five pounds or more; without the assistance offered by a compressor this casing-head gas could not have been introduced into the Jude Branch line; the amount of gas thereby introduced during the damage period was 210,455 mcf. (this is here and subsequently used to denote one thousand cubic feet); if the production of gas by Jacket had been routed through this compressor, it is open to serious question whether the actual production of gas by Jacket would have been greatly increased.

On these factual findings, the Master reached the conclusion that United's operation of the Slick Rock Compressor was a violation of the sales contract, by virtue of which Jacket was entitled to damages. He further concluded that these damages should be computed on the theory that during the damage period Jacket (over and above its actual deliveries of gas during this period) should have been allowed to deliver the same quantity of gas as that produced by United from the Slick Rock Wells, namely, 210,455 mcf.

■ The Master's findings of fact here were again adopted by the District Court. The Court, however, reached these conclusions: (1) United's operation of the Slick Rock Compressor was not a violation of the sales contract; (2) there is no evidence in the case from which Jacket's "damages, if any, could be even remotely guessed at."

With the first of these conclusions of the District Court we cannot agree. We are, however, in complete accord with the Court on the second conclusion, and that is sufficient, on this appeal, to dispose of

any questions concerning the Slick Rock Compressor.

We cannot agree with the ingenious reasoning of the District Court by which the conclusion was reached that the operation of the Slick Rock Compressor was not a violation of the sales agreement. To us it seems that Paragraph Third (quoted supra) is indeed explicit and quite clear, without the need of any acute analysis of the surrounding facts and circumstances. It was drawn, we think, expressly to cover and prohibit any situation such as that created by the Slick Rock Compressor.

Among other provisions of Paragraph Third, we find:

" * * * all gas delivered into Buyer's lines, from said district (Mingo-Wayne Gas District) including that produced by Buyer from lands on (or) properties owned or controlled by it, shall be delivered and accepted *under equivalent conditions and on equal terms, with reference to all important factors such as head or line pressure against which Seller's gas or other gas from said district, is delivered, and the means by which gas is introduced or forced into Buyer's* receiving lines." (Italics ours.)

"*That is to say,* that Seller shall at no time be discriminated against, or placed at a disadvantage, actually or relatively, as compared with any other producer of gas in said district, *including the Buyer,* making deliveries of gas into Buyer's receiving line or lines, *by being required to deliver its gas to Buyer against a higher pressure or against any discrimination whatsoever;* nor shall Buyer allow other producers in said district to force their gas into Buyer's receiving line or lines by Compressors, Boosters, Pumps or other artificial means; *nor shall the Buyer force gas produced by it into its own lines, by such means, unless employed in such manner as to work equally and fully to the aid and advantage of the Seller."* (Italics ours.)

Nor do we think United is aided here by the last sentence of Paragraph Third, for though this gives to United the right to operate a Booster station, this right is expressly limited by the last words of this same sentence: "Seller's gas and all other gas (including that produced by Buyer) received by Buyer from said district, *shall pass on equal terms* and under *like conditions as to pressure,* into Buyer's receiving lines." (Again italics are ours.)

This brings us to the question of damage to Jacket from the operation of the Slick Rock Compressor. In his report, the Master stated: "Assuming that its (Jacket's) production had been routed through the Slick Rock compressor, it may be questioned if plaintiff's production would have been greatly increased." The District Court went even further when it said: "I am of opinion further that there is no evidence in the case from which Red Jacket's damages, if any, could be even remotely guessed at."

It is our considered view that Jacket's case falls down here from a failure to produce adequate evidence to prove, with that reasonable certainty which the law requires, the existence, the nature and the extent of the damages which it here claims to have suffered. Jacket has in truth introduced a vast mass of evidence. This is not lacking in quantity; it is lacking in quality. In all the chaff, there is little wheat. This evidence fails to establish certain essential links in the required chain of causation between the violation of the contract and any attendant damage. What would have been the effect on Jacket's production, had there been no Slick Rock compressor? To what extent, if any, did the gas pumped into the V line by the Slick Rock compressor displace (or prevent Jacket from delivering) gas from Jacket's wells on the Kirk Branch line? The record discloses no adequate answer to these questions. And, under these circumstances, those answers cannot be left to pure conjecture, to mere speculation or to unfounded hypothesis.

The District Court, 58 F.Supp. 397, at some length, discussed ably these questions from the technical standpoint of conditions of production and line pressures. We think it would serve no useful purpose to add to that discussion. Probably other factors in this complicated picture might be pointed out which would serve to indicate even more clearly the weakness of Jacket's case. All the intricate graphs and elaborate charts prepared and submitted by Jacket are interesting, but they simply fail in probative effectiveness.

■ We are in hearty accord with Jacket's contention that *absolute exactitude* is not essential in measuring damages;

Williston on Contracts (1920) Vol. 3, § 1345, p. 2401; Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 379, 47 S. Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544. The true rule to be applied here has been often stated. In the Eastman Kodak case, supra [273 U.S. 359, 47 S.Ct. 405], the Supreme Court approved this instruction: "Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a *reasonable basis of computation is afforded,* though the result be only approximate." (Italics ours.) See, also, Palmer v. Connecticut Railway & Lighting Co., 311 U.S. 544, 560–562, 61 S.Ct. 379, 85 L.Ed. 336. In the American Law Institute's Restatement of the Law of Contracts, Vol. 1, § 331, it is said: "Damages are recoverable for losses caused and other gains prevented by the breach, only to the extent that the *evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.*" (Italics ours.) See, also, 15 Amer.Jur. "Damages" § 20, p. 410; 78 A.L.R. 858. And see the West Virginia cases of Grass v. Development Co., 75 W.Va. 719, 84 S. E. 750, L.R.A.1915E, 1057; Dillard v. Gas Co., 114 W.Va. 684, 173 S.E. 573; Trimble v. Hope Natural Gas Co., 117 W.Va. 650, 187 S.E. 331.

### (6) *The Summer-Winter Ratio.*

■■ The interpretation of Paragraph Third and Paragraph Fourth of the sales agreement, as to the true meaning of the agreement on the summer-winter ratio, presents a question of law. The Master interpreted the agreement in favor of Jacket's contention. The District Court, with which we agree, overruled the Master in favor of the contention of United.

We think, again, it is not necessary to add materially to what was said on this phase of the case in the opinion below. It is clearly the function of a court to give effect to contracts as they are written; a court cannot add a provision to the contract merely because the court thinks either that such a provision should be in the contract or that the parties would have inserted a provision covering a particular contingency had that contingency occurred to them. Tahir Erk v. Glenn L. Martin Co., 143 F.2d 232, 234, decided by this Court; Trimble v. Hope Natural Gas Co., 117 W.Va. 650, 669, 187 S.E. 331.

We think (as did the District Court) that the language of Paragraph Third and Paragraph Fourth is quite plain and unambiguous. Paragraph Fourth quite definitely requires United, during the summer months "to take only one-third of the gas that was taken during the preceding (winter) months." Then this paragraph goes on to specify the means or measures that United may adopt or take to bring about this result.

Had Jacket proved, in addition to a violation of contract for the winter period, that Jacket (during that period) had been deprived of the right to deliver a certain quantity of gas (e. g., 150,000 mcf.), then it might forcefully be urged that Jacket might recover damages not only for this 150,000 mcf. but also for one-third of this amount (50,000 mcf.) which it was wrongfully prevented from delivering during the summer period. But, as we have indicated, Jacket made no such showing. In the absence of such a showing, were we to allow Jacket (as it claims) damages based solely on the quantity of gas produced by United from its own wells during the summer period, this, we think, would amount to no less than a clear perversion of Paragraphs Third and Fourth of the contract. We cannot read into this contract a provision that whenever United marketed during the summer period more than one-third of its own production for the winter period, Jacket is thereby ipso facto entitled to any increased delivery during the summer period. We must not see upon the juristic stair a contractual man who isn't there.

### (7) *Measure of Damages.*

In the report of the Master, the opinion of the District Court, and the briefs of appellant and appellee, no little attention is given to the measure of damages. Thus Jacket claims it is entitled to the full contract price of all the gas which it was wrongfully prevented from delivering. United insists (if damages be allowed) that the only damage Jacket has suffered (on the theory that Jacket still has this gas) is interest on this contract price, representing the value of the use of the money to Jacket, which Jacket would have received had the gas been received and paid for by United at the earlier time.

In the light of what has been previously said as to Jacket's failure to prove damages with any reasonable certainty, it

is not necessary for us to pass upon, or even to discuss, the proper measure of damages.

(8) *Injunction.*

It follows from the previous portions of this opinion that Jacket failed to make a showing which would entitle it to an injunction.

The judgment of the District Court is affirmed.

Affirmed.